UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOW CORNING CORPORATION and
HEMLOCK SEMICONDUCTOR
CORPORATION,

        Plaintiffs,

                                            Case Number 11-10008-BC
v.                                       Honorable Thomas L. Ludington

JIE XIAO, a/k/a Georg Xiao, LXENG,
LLC, and LXE SOLAR, INC.,

        Defendants.
_____ /

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

Plaintiffs Dow Corning Corporation and Hemlock Semiconductor Corporation allege that Defendants Jie (George) Xiao, LXEng LLC, and LXE Solar, Inc., stole Dow Corning's trade secrets and misused its trademarks in an effort to lure customers away from Plaintiffs' trichlorosilane ("TCS") and polysilicon businesses. Plaintiffs filed a seven-count complaint on January 3, 2011, alleging claims for misappropriation of trade secrets under Michigan law; trademark infringement in violation of the Lanham Act; false advertising, false representation, and unfair competition in violation of the Lanham Act; trademark dilution in violation of the Lanham Act; unfair competition in violation of Michigan law; violations of the Michigan Uniform Trade Practices Act; and tortious interference with a contract in violation of Michigan law.

Defendants filed a motion to dismiss on January 26, 2011, contending that Plaintiffs' federal claims do not state a claim for relief under the Lanham Act. Fed. R. Civ. P. 12(b)(6). Defendants further contend that Plaintiffs' state claims should be dismissed for lack of jurisdiction or on their merits. Plaintiffs filed a response on February 23, 2011, and Defendants filed a reply on March 9,

2011. For the reasons explained below, the motion will be granted in part and denied in part.

## I.

Dow Corning is a Michigan corporation that manufactures silicon products, including TCS. Pls.' Compl. ¶ 3. Hemlock Semiconductor is also a Michigan corporation that manufactures polycrystalline silicon, or polysilicon, using Dow Corning's TCS as one of the components. *Id.* ¶ 4. Dow Corning owns a majority of Hemlock Semiconductor's shares. *Id.* Xiao is a chemist who lives and works in New Jersey. *Id.* ¶ 4.

In 2007, Xiao and Michael Little, a chemical engineer formally employed by Dow Corning, started LXEng, a limited liability company formed under the laws of Nevada. *Id.* ¶¶ 5–6. Little and Xiao each owned a fifty-percent stake in the company and they worked from their homes in Sanford, Michigan and Randolph, New Jersey, respectively. *Id.* Little worked for Dow Corning for nearly twenty-five years before leaving the company in May 2002. *Id.* ¶ 25. For a period of time, Little led Dow Corning's TCS production facility in Midland. *Id.* Little signed several contractual agreements while he was employed by Dow Corning, promising, inter alia, not to disclose "any trade secret, confidential know-how or confidential business or technical information of Dow Corning." *Id.* ¶ 26. Although both Little and Xiao were chemists, Little had more expertise in the TCS and polysilicon industries. *Id.* ¶ 29. Xiao worked in the pharmaceutical industry before joining LXEng. *Id.*

Shortly after LXEng was formed, the company secured two contracts for approximately $18 million to provide polysilicon and TCS technology to a pair of companies, which are identified only as "Company A" and "Company B" in Plaintiffs' complaint. *Id.* ¶ 33. Plaintiffs' further allege that LXEng entered into negotiations with two additional companies, "Company C" and "Company D,"

for two additional contracts for as much as $12 million. *Id.* ¶ 34. During the course of those negotiations, Plaintiffs allege that Little and Xiao disclosed Dow Corning trade secrets to their customers, including "specifications and characteristics of Dow Corning's fluid bed reactors." *Id.* ¶ 35–36. Plaintiffs further allege that Little, who was a pilot and photographer, conducted aerial surveillance of Plaintiffs' manufacturing facilities in Michigan and used that information to explain the manufacturing processes to LXEng's prospective clients. *Id.* ¶ 37.

On November 3, 2007, Little died when the plane he was flying crashed near Gladwin, Michigan. *Id.* ¶ 39. Soon afterward, Xiao and LXEng contacted other Dow Corning employees, including Earl Pataky, and placed advertisements in Michigan publications seeking to hire Plaintiffs' employees with expertise in the polysilicon and TCS industries. *Id.* ¶¶ 42–43. The following March, Dow Corning's counsel wrote a letter to Xiao and LXEng, expressing concern that Little may have shared Dow Corning's trade secrets with LXEng and its customers and emphasizing Dow Corning's intent to "protect its trade secrets and other intellectual property rights." *Id.* at 41. Dow Corning asked Xiao and LXEng to consent to an independent inspection of a laptop computer that was used by Little before his death. *Id.* Xiao and LXEng refused. *Id.*

At approximately the same time, Little's estate exercised an option to sell Little's share of LXEng, seeking $6,725,000. *Id.* ¶ 50. A dispute between Little's estate and Xiao about the value of LXEng is currently in arbitration. *Id.* According to Plaintiffs, Xiao was concerned about liability to Dow Corning for the alleged misuse of Dow Corning's intellectual property and liability to Little's estate for Little's share of LXEng. *Id.* ¶ 51. In response, Xiao formed LXE Solar in the Carribean nation of Nevis, placing the new company's assets in a bank account in the Republic of Scychelles. *Id.* ¶ 52. LXE Solar has continued LXEng's business, securing a $10 million contract

-3-

with Company E shortly after its formation. *Id.* ¶ 54. Xiao is the only shareholder of LXE Solar. Although Little was never affiliated with LXE Solar, Plaintiffs assert that the trade secrets Little shared with Xiao and LXEng are still in use by the new company. *Id.* ¶ 55. Plaintiffs assert that LXE Solar is the "successor to LXEng and the alter ego of Xiao." *Id.* ¶ 7.

Plaintiffs assert that Defendants continued use of their trade secrets and trademarks have caused significant harm to Dow Corning and Hemlock Semiconductor. They emphasize that they entered the polysilicon industry more than fifty years ago, and have devoted substantial resources to developing their polysilicon brand and protecting the "DOW CORNING®" and "THE DOW CORNING®" trademarks, which have garnered "widespread and favorable public acceptance and recognition." *Id.* ¶¶ 12–17. Plaintiffs further note that Dow Corning selected Hemlock, Michigan as the site for its polysilicon plant in 1960, and formed Hemlock Semiconductor in 1979. *Id.* ¶ 19. TCS and polysilicon manufacturing requires a multi-step process that has proven difficult to replicate, which substantially increases the value of Dow Corning's trade secrets and manufacturing processes. *Id.* ¶¶ 20–22. According to Plaintiffs, Defendants modeled their business on providing Dow Corning's trade secrets to Dow Corning's competitors for a substantial profit. *Id.*

On January 3, 2011, Plaintiffs filed a seven-count complaint against Defendants, alleging in Count I that Defendants' misappropriation of Plaintiffs' trade secrets violates the Uniform Trade Secrets Act, Mich. Comp. Laws §§ 445.1901–.1910. In Counts II, III, and IV, Plaintiffs allege that Defendants violated various provisions of the Lanham Act, which prohibit trademark infringement, false advertising, unfair competition, and trademark dilution. 15 U.S.C. §§ 1114(1), 1125(a) & (c). In Counts V, VI, and VII, Plaintiffs allege that Defendants' business practices violate Michigan law.

Defendants filed a motion to dismiss on January 26, 2011, arguing that Plaintiffs' claims

-4-

against LXE Solar should be dismissed without prejudice because this Court does not have personal jurisdiction over LXE Solar.  Fed. R. Civ. P. 12(b)(2).  Defendants further contend that all of Plaintiffs claims should be dismissed for failing to state a claim on which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Defendants' Rule 12(b)(6) motion will be discussed first, followed by attention to the Rule 12(b)(2) motion.

## II.

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2).  The requirement is meant to provide the opposing party with " 'fair notice of what the . . . claim is and the grounds upon which it rests.' "  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 42, 47 (1957)).  If a complaint does not meet that standard, the opposing party may move to dismiss it for failure to state a claim at any time before filing an answer.  Fed. R. Civ. P. 12(b)(6).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (2007) (citations omitted).  "Factual allegations must be enough to raise a right to relief above a speculative level, on the assumption that all the allegations in the complaint are true . . . ."  *Id.* at 555–56 (citations omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570)).  "Facial plausibility" requires the plaintiff to include sufficient "factual

-5-

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## A.

The Lanham Act provides that any person or entity who "uses in commerce" a registered trademark "in connection with the sale, offering for sale, distribution, or advertising of any good or services" where the "use is likely to cause confusion, . . . shall be liable in a civil action" brought by the owner of the mark. 15 U.S.C. § 1114(a); *see also Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (stating the elements of a trademark infringement claim). The parties agree that "DOW CORNING®" and "THE DOW CORNING®" are registered trademarks, but they dispute whether Defendants used those marks "in commerce" and whether such use was likely to cause confusion.

## 1.

Defendants first contend that their use of Dow Corning's trademarks was not a use "in commerce." As an initial matter, the "use in commerce" element is nothing more than a jurisdictional hook included by Congress to demonstrate its regulatory authority over the subject matter. If the use is not "in commerce," Congress does not have the authority to regulate it under the Commerce Clause. *See United We Stand Am., Inc. v. United We Stand Am. N.Y., Inc.*, 128 F.3d 86, 92 (2d Cir. 1997) ("The history and text of the Lanham Act show that 'use in commerce' reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause . . . ."). The "use in commerce" requirement is not intended as a further restriction on the otherwise redundant requirement that the use be "in connection with the sale, offering for sale, distribution, or advertising of any goods or services." 15 U.S.C. § 1114. If "use in commerce" were intended to be construed

narrowly, as Defendants suggest, the further requirement that the use be "in connection with the sale, offering for sale, distribution, or advertising of any goods or services" would be unnecessary.

Plaintiffs' complaint clearly alleges that Defendants used the "DOW CORNING®" and "THE DOW CORNING®" marks in connections with such uses. For example, Plaintiffs allege that in the process of recruiting new clients, Defendants emphasized that they had "pull[ed] all experiences from Dow Corning" and that their technology was "based on both Dow Corning" and another company's products. Pls.' Compl. ¶ 48; *see also id.* ¶ 69. Plaintiffs have properly alleged that Defendants' use of their mark was "in connection with the sale, offering for sale, distribution, or advertising of any good or services" and "in commerce." 15 U.S.C. § 1114.

Other provisions of the Lanham Act further support this conclusion. The statute defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade." 15 U.S.C. § 1127. Further, a mark used to sell services is deemed to be used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. § 1127. In this case, Plaintiffs have alleged that Defendants repeatedly used Dow Corning's trademarks to help identify Defendants products. As Defendants admit, Dow Corning's trademarks where used "(a) as a point of comparison (b) as a source of Little's experience, [and] (c) as an explanation of the type of services to be delivered" by Defendants. Thus, Defendants used the marks "in commerce."

## 2.

Defendants next contend that Plaintiffs' trademark infringement claim should be dismissed because Plaintiffs cannot demonstrate "likelihood of confusion." The Lanham Act prohibits use of a trademark that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,

connection, or association of such person with another person, or as to the origin, sponsorship, or approval, of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125 (a)(1)(A). As Plaintiffs emphasize, the likelihood of confusion element does not require that the consuming public believe Dow Corning was the source or origin of Defendants products and services. Rather, Plaintiffs can prevail by demonstrating that the public believed that Dow Corning "sponsored or approved" Defendants products or services. *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 834 (6th Cir. 1983) (citations and emphasis omitted). Indeed, "[t]he ultimate question [is] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991).

The Sixth Circuit has identified eight factors that may be considered when evaluating whether consumers are likely to be confused:

1. Strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark;
8. likelihood of expansion of the product lines.

*Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). "These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Homeowners Group, Inc.*, 931 F.2d at 1107.

Plaintiffs contend that they have alleged each of the *Frisch* factors in their complaint.

1) The Dow Corning mark is "unique and famous" and has acquired "strong secondary meaning and fame." Compl. ¶¶ 14-15.

-8-

2)  Defendants sells [sic] goods and services "closely related" to Dow Corning's products.  *Id.* ¶ 73.

3)  Defendants used the words "Dow Corning" to describe its products.  *Id.* ¶ 47.

4)  "On information and belief, consumers have actually been confused as a result of Defendants' products."  *Id.* ¶ 73.

5)  "Defendants marketed their products and/or services directly to companies and individuals" that are current or likely Dow Corning customers.  *Id.*; *see also id.* ¶¶ 47-48.

6)  Defendants' unauthorized use of the Dow Corning mark was "likely to cause consumer confusion" among purchasers, who "may . . . associate the quality" of defendants' goods and services with Dow Corning even if they realize there is no affiliation between defendants and Dow Corning.  *Id.* ¶ 72-73.

7)  It was defendants' "specific intent to use the DOW CORNING® trademark . . . to profit from consumers' association of the . . . trademark with Dow Corning."  *Id.* ¶ 73.

8)  Defendants have made repeated attempts to use the Dow Corning trademark to penetrate the market for TCS and polysilicon process technologies.  *See id.* ¶¶ 33-34, 47, 55.

Pls.' Br. at 14–15 (quoting Pls.' Compl.).  Plaintiffs argue that consumers are likely to be confused at the "point-of-sale" by misleading language, which includes the Dow Corning mark, that is used in Defendants' communications with their customers.  Pls.' Compl. ¶ 55.  Plaintiffs further contend that consumers will be confused "post-sale," believing that Defendants' products and services are "associate[d]" with Dow Corning.  *Id.* ¶ 72.  Finally, Plaintiffs contend that consumers will be confused at the "initial interest" phase of the transaction, believing Dow Corning is "affiliated" with Defendants' products and services.  *Id.* ¶ 71.

In response, Defendants admit that Plaintiffs' complaint contains the elements of a likelihood of confusion claim, but assert that it does not include sufficient factual allegations to rise from merely possible to plausible.  *See Iqbal*, 129 S. Ct. at 1949.  Defendants emphasize that the relevant

"consumers" interested in TCS and polysilicon technology are sophisticated business organizations spending millions of dollars on highly technical products. According to Defendants, such organizations "could not be confused into thinking for even a nanosecond that Defendants were affiliated with Dow Corning." Defs.' Reply at 2.

**a.**

Before turning to the *Frisch* factors, it is worth emphasizing that this is not a typical trademark infringement case. In the typical case, the defendant's mark is arguably similar to the plaintiff's mark and the plaintiff argues that the defendant's use of a similar mark has confused consumers. Here, Plaintiffs' marks and Defendants' marks are not similar in any way. As a result, Plaintiffs' trademark infringement claim is based on their contention that Defendants used Plaintiffs' marks in such a way that consumers were likely to believe that Plaintiffs were the source of or were affiliated with Defendants products.

Importantly, if Defendants were not using the Dow Corning marks "in a way that identifies the source of [Defendants'] goods" or services, Plaintiffs were not using the marks in a "trademark way" and there is no liability for trademark infringement. *Hensley Mfg.*, 579 F.3d at 610 (citing *Interactive Products*, 326 F.3d at 695). That is, if Defendants were using the marks only as a point of comparison to their products and to identify the source of Little's experience, they cannot be liable for trademark infringement under the Lanham Act. Although the complaint alleges substantial wrongdoing by Defendants, it does not plausibly allege that Defendants' used Plaintiffs' trademarks in a "trademark way." Plaintiffs' assertion that potential TCS and polysilicon customers were likely to be confused by Defendants' use of the Dow Corning marks into believing that Dow Corning was the source of, or otherwise associated with, Plaintiffs' products is implausible.

In *Hensley Manufacturing*, the Sixth Circuit explained what it means to use a trademark in a "non-trademark way." Jim Hensley invented a trailer hitch designed to eliminate trailer sway, which he called the "Hensley Hitch" or the "Hensley Arrow." *Hensley Mfg.*, 579 F.3d at 606–07. On February 22, 1994, Jim Hensley sold the hitch design and the right to market the design under the Hensley name to Hensley Manufacturing. *Id.* at 607. Jim Hensley continued to be affiliated with his namesake company until sometime in 2007, when he left Hensley Manufacturing, along with its sales and marketing director, and started his own company, ProPride. *Id.* ProPride also manufactured an anti-sway trailer hitch, which it markets as the "3P Hitch." *Id.* ProPride's advertisements, in print and on the Internet, emphasized that the 3P Hitch was designed by Jim Hensley. One example stated: "Only one man has ever designed a trailer hitch that effectively eliminates trailer sway before it begins. That man is Jim Hensley. NOW he has done it again and IMPROVED the PERFORMANCE of his old design." *Id.* The advertisement included a disclaimer, noting that Jim Hensley was no longer affiliated with Hensley Manufacturing. Another advertisement, from the Internet auction site eBay, provided: "Used Hensley Arrow® hitch? Buy NEW Jim Hensley Design." *Id.* at 608. The eBay advertisement also included a disclaimer. *Id.*

In affirming the district court's dismissal of Hensley Manufacturing's complaint on a Rule 12(b)(6) motion, the Sixth Circuit concluded that the facts alleged in the complaint were not sufficient to show a likelihood of confusion.

> Hensley Manufacturing does not claim that ProPride has marked its trailer hitch products with the trademarks "Hensley," "Hensley Arrow," or even "Jim Hensley." The name of ProPride's product, the "Pivot Point Projection Hitch" or "3P Hitch," is not even remotely similar to the "Hensley" trademark. Instead, the complaint challenges ProPride's use of Jim Hensley's name in connection with its advertising of the 3P Hitch.
> . . .
> Ultimately, the [advertisements] describe Jim Hensley's association with ProPride,

-11-

his design of the ProPride 3P Hitch, and his former association with Hensley Manufacturing.  They do not identify Hensley Manufacturing, or even "Hensley," as the source of ProPride's products or suggest any current association between Hensley Manufacturing and Jim Hensley or ProPride.  In fact, the advertisements make clear that Jim Hensley is no longer associated with Hensley Manufacturing. Moreover, they always refer to "Jim Hensley" and never simply use the word "Hensley" in connection with the 3P Hitch.

*Id.* at 610–11.

As in *Hensley Manufacturing*, Plaintiffs do not claim that Defendants have marked their products with Dow Corning's trademarks, or that Dow Corning's trademarks are similar to Defendants trademarks.  Rather, Plaintiffs suggest that the marketing materials quoted in Plaintiffs' complaint are likely to create confusion among consumers about whether Dow Corning is the source of, or otherwise affiliated with, Defendants products.  Plaintiffs' trademark infringement claim will be dismissed because none of Defendants' marketing communications suggest that Dow Corning is the source of Defendants' products or affiliated with Defendants' products in any way.

For example, in one e-mail, referenced in Plaintiffs's complaint (paragraphs 45 and 47), Xiao uses Dow Corning's trademark, but not in a way that could cause confusion about the source of LXEng's products.

LX is focusing on getting all questions answered and inputs incorporated in designs by collectively pulling all experiences from Dow Corning (Mike downloaded most of his experiences into LX and CDI's process designs), REC and MEMC.  I do not want to limit ourself [sic] to certain one's design and am open to all inputs to ensure the best operational TCS plant.[1]

----

[1] Although, as Defendants emphasize, the e-mails were selectively quoted in Plaintiffs' complaint without including contextual information, the Court is entitled to consider all "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Accordingly, the Court can consider the entire text of the e-mails, and not just the portion excerpted in Plaintiffs' complaint.

-12-

[Dkt. # 19].  In another e-mail, Mike Little reassures a leery customer that LXEng has substantial experience in the polysilicon and TCS industries, referencing Little's experience at Dow Corning, but he does not even use the Dow Corning Trademark.  [Dkt. #19-A].  While Defendants used the Dow Corning mark in marketing communications, they used it as a point of comparison and as a source of Mike Little's experience, but they did not use it to identify the source of their products or suggest an affiliation with Dow Corning.  As such, they have not included factual allegations that "allow[] the court to draw the reasonable inference" that Plaintiffs will be able to demonstrate likelihood of confusion.  *Iqbal*, 129 S. Ct. at 1949.

### b.

Moreover, even if Defendants were using Dow Corning's trademarks in a "trademark way," it is unlikely that they could demonstrate a likelihood of confusion under *Frisch* following discovery.  670 F.2d at 648.  Pursuant to the first *Frisch* factor, Plaintiffs allege many facts to support their assertions that their marks are famous, at least within the relevant industry.  Dow Corning and Hemlock Semiconductor have devoted substantial resources to developing polysilicon and TCS products, and both companies are market leaders in their respective businesses. Defendants use of Dow Corning as a point of comparison demonstrates the power of the brand in the polysilicon and TCS business.  Thus, the first factor favors Plaintiffs.

Turning to the second factor, the parties agree that Plaintiffs compete with Defendants in the TCS and polysilicon business.  As to the third factor, Defendants have not used a trademark similar to "Dow Corning" to identify any of their products.  Thus, the second factor favors Plaintiffs, but the third favors Defendants.

The fourth factor favors neither party at this stage.  Although there is no evidence that any

consumer was "actually confused" by Defendants use of the Dow Corning mark, Plaintiffs suggest that such evidence will be revealed during discovery.  Pls.' Compl. ¶ 73.

The fifth factor, "marketing channels used," would seem to favor Defendants.  The challenged communications are direct contacts targeted at specific consumers where the sender has been clearly identified.  It seems that the consumer is less likely to be confused by a targeted communication than by a broad advertisement targeted at a general audience, such as one might see on the Internet or in a newspaper.

The sixth factor, the degree of purchaser care, also strongly favors Defendants.  The target audience for the challenged communications consists of sophisticated and focused consumers.  It seems highly unlikely that such clients would be confused about who they were dealing with or the origin or source of the products and services they were purchasing.  Little's experience as a long-time Dow Corning employee is featured prominently in the materials to demonstrate LXEng's ability to compete in the industry.  Sophisticated business clients are unlikely to mistake those references for a suggestion that Dow Corning is sponsoring LXEng or otherwise affiliated with the new company.

The seventh and eighth factors are not particularly relevant to this case.  It is clear that Defendants referenced Dow Corning's trademarks in their marketing communications in an attempt to suggest that their products compared favorably to Dow Corning's products.  But they did not deliberately choose a mark similar to Dow Corning's mark, indeed there is no resemblance between Plaintiffs' marks and Defendants' marks at all. Therefore, Defendants did not "choose a mark" in an attempt to confuse the consumers.  Similarly, the parties papers indicate that TCS and polysilicon are very specific and focused industries.  There is no indication that Defendants intend to expand

-14-

beyond those industries.

Ultimately, even if Plaintiffs could demonstrate that Defendants' used the "Dow Corning" mark in a trademark way, it would be difficult for Plaintiffs to prove that the sophisticated buyers of their extremely "expensive" and rather "unusual" products were confused about who they were dealing with. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr*, 109 F.3d 275, 285–86 (6th Cir. 1997) (quoting *Homeowners Group*, 931 F.2d at 1111).

### c.

Finally, Defendants' allege that the trademark infringement claim should be dismissed because the uses of the trademark described in the complaint are "fair uses" entitled to protection under federal law. Under the Lanham Act, it is a defense to trademark infringement if the mark was used "fairly and in good faith only to describe the goods or services of such party, or their geographic origin." 15 U.S.C. § 1115(b)(4). Under the fair use doctrine, " 'the holder of a trademark *cannot* prevent others from using the word that forms the trademark in its *primary* or *descriptive* sense.' " *Hensley Mfg.*, 579 F.3d at 612 (quoting *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 319 (6th Cir. 2001)). A defendant is entitled to the fair use defense if its use of the mark was "(1) in its descriptive sense; and (2) in good faith." *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 920 (6th Cir. 2003).

Again, Defendants used the Dow Corning mark descriptively, to identify Little's former employer and the company where Little learned about TCS and polysilicon. As explained in Part B. below, however, Plaintiffs' allege that the descriptive use of the mark was also intended to deceive customers. While potential customers were unlikely to be confused about the affiliation or source of Defendants' products, they may nevertheless have been misled about the technology

-15-

underlying the products.  As a result, the descriptive use of the mark may not have been in "good

faith."  15 U.S.C. § 1115(b)(4).

## B.

Defendants next contend that Plaintiffs' complaint does not state a claim for false advertising

or unfair competition under 15 U.S.C. § 1125 (a)(1)(B).[2]  The statute provides:

> Any person who, on or in connection with any goods or services, or any container
> for goods, uses in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which– . . . in
> commercial advertising or promotion, misrepresents the nature, characteristics,
> qualities, or geographic origin of his or her or another person's goods, services, or
> commercial activities, shall be liable in a civil action by any person who believes that
> he or she is or is likely to be damaged by such act.

In short, the statute prohibits misleading commercial speech about one's own products or the

products of a competitor that is likely to influence and deceive the intended audience.  *See Am.*

*Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185

F.3d 606, 613 (6th Cir. 1999).  There must also be a causal connection between the misleading

speech and the harm to the plaintiff.  *Id.*

Defendants first contend that Plaintiffs' false advertising claim should be dismissed because

the communications identified in Plaintiffs' complaint did not target a large enough segment of the

market to constitute "commercial advertising or promotion."  15 U.S.C. § 1115(a)(1)(B).  A

particular communication constitutes commercial advertising or promotion only if it is

"disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or

---

[2] Defendants contend that false advertising must be pleaded with particularity under Rule
9(b).  The Rule provides that fraud claims must be pleaded with particularity, but it makes no
mention of false advertising claims.  Defendants have not identified a Sixth Circuit case
requiring a heightened pleading standard for such claims.

'promotion' within that industry." *See White Mule Co. v. ATC Leasing Co.*, 540 F. Supp. 2d 869, 897 (N.D. Ohio 2008). The extent of the required dissemination varies depending on the size of the market. Indeed, communications to only one or two clients will constitute "commercial advertising or promotion" in certain circumstances where the market is unusually small. *See Champion Labs., Inc. v. Parker-Hannifin Corp.*, 616 F. Supp. 2d 684, 695–696 (E.D. Mich. 2009) (concluding single communication was sufficient where the market Duramax fuel filters consisted of a single client, General Motors); *Int'l Techs. Consultants, Inc. v. Stewart*, No 07-13391, 2008 WL 4378095, at *6–7 (E.D. Mich. Sept. 23, 2008) (concluding two letters to customer and customer's financier were sufficient where market for construction of float glass plants was extremely small).

Here, as in *Champion Labs* and *International Technologies Consultants*, the market for the technological expertise to build a TCS or polysilicon plant is extremely small. As Defendants admit in their reply brief, there are at most 128 companies currently manufacturing or studying the potential for manufacturing TCS and polysilicon. Those companies, which have already made or are considering making multi-million dollar investments in technology, will not respond to advertisements in general interest publications or even mass mailings. Potential suppliers will be required to target the buyers individually in communications tailored specifically for their needs. In such a circumstance, the handful of e-mail communications identified in Plaintiffs' complaint constitute "commercial . . . promotion" within the meaning of the Lanham Act. 15 U.S.C. § 1115(a)(1)(B); Pls.' Compl. ¶¶ 45–47, 55.

Defendants next contend that Plaintiffs' complaint does not plead all of the elements of a Lanham Act false advertising claim. Specifically, Defendants contend that Plaintiffs do not plead that the identified promotional communications "actually or tend[] to deceive a substantial portion

-17-

of the intended audience." *Am. Council of Certified Podiatric Physicians and Surgeons*, 185 F.3d at 613.

In paragraph 83 of their complaint, Plaintiffs allege that "Defendants' misleading promotional communications, sales pitches, and/or business solicitations were designed and are likely to influence purchasing decisions." Plaintiffs identify several such communications. Pls.' Compl. ¶¶45–47, 55. In one of the identified communications, Xiao assured a reluctant customer following Little's death that Little had earlier "downloaded most of his experiences." *Id.* ¶ 45. The representation could plausibly mislead a potential customer into thinking that Little had shared confidential or proprietary information with LXEng and Xiao before his death. It could deceive a customer into believing that LXEng can and will provide insider information about the technology at a discount price. While sophisticated TCS and polysilicon customers were not likely to be confused about the source of LXEng's products or whether LXEng was affiliated with Dow Corning, it is plausible that LXEng's marketing communications actually deceived potential customers about the extent to which Little had access to Dow Corning's proprietary information and his ability to deliver that information to customers. In short, even though the customers knew they were not dealing with Dow Corning or one of its affiliates, it is plausible that the customers were led to believe that Little and Xiao could deliver proprietary information that they had no legal right to share. *See* 15 U.S.C. § 1115(a)(1)(B) (prohibiting misleading commercial promotional materials that are intended to deceive the intended audience).

Finally, Defendants also contend that Plaintiffs have not stated a claim for monetary damages or injunctive relief. To receive monetary damages or injunctive relief, Plaintiffs will have to prove by a preponderance of the evidence that an actually false or true but misleading claim made by

Defendants in a promotional communication caused Plaintiffs harm. *Am. Council of Certified Podiatric Physicians and Surgeons*, 185 F.3d at 613. As already discussed, Defendants statements could be interpreted as actually false and intended to deceive. If they influenced a potential Dow Corning customer to utilize Defendants' services instead, they caused harm to Plaintiffs. Accordingly, Plaintiffs' have alleged a plausible claim for both monetary and injunctive relief.[3]

## C.

In their complaint, Plaintiffs assert that Defendants use of the Dow Corning trademark will blur the distinctiveness of the Dow Corning mark and tarnish its reputation. Pursuant to the Lanham Act,

> the owner of a famous mark that is distinctive, . . . shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1). Dilution by blurring occurs when "the similarity between a mark or trade name and a famous mark . . . impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). Dilution by tarnishment occurs when "the similarity between a mark or trade name and a famous mark . . . harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C).

To prevail on a dilution claim, "[t]he senior mark must be (1) famous; and (2) distinctive. Use of the junior mark must (3) be in commerce; (4) have begun subsequent to the senior mark becoming famous; and (5) cause dilution of the distinctive quality of the senior mark." *AutoZone,*

---

[3] Defendants relatedly argue that the alleged false statements were not material—i.e. they did not actually influence a potential purchaser. It seems, however, that a statement to the affect that Defendants are in possession of proprietary Dow Corning technology could influence an actual purchaser. Accordingly, Plaintiffs have stated a plausible claim for relief.

*Inc. v. Tandy Corp.*, 373 F.3d 786, 802 (6th Cir. 2004).

Here, there cannot be a traditional dilution claim because Defendants' marks are not similar to the Plaintiffs' marks. That is, there is no "junior mark" that is similar to Dow Corning's "senior mark." *See id.* Nevertheless, Plaintiffs argue that by using the actual Dow Corning mark, Defendants have tarnished the reputation of the mark and blurred its distinctiveness. *See Audi AG v. D'Amato*, 469 F.3d 534, 547 (6th Cir. 2006).

In *Audi*, the defendant started a website, www.audisport.com, where he sold merchandise with the "Audi Sport" logo and Audi's distinctive "ring" mark. *Id.* at 539–40. He also offered e-mail subscriptions for people interested in an @audisport.com address. *Id.* The message on the website's homepage provided: "Who are we? We are a cooperative with Audi of America, and will be providing the latest products for your Audi's [sic] and information on Audisport North America." *Id.* at 540. In reality, the www.audisport.com website was not affiliated with the real Audi in any way. In fact, Audi was attempting to run its own website, www.audi.com, where similar but authentic merchandise was sold. The Sixth Circuit concluded that the using Audi's trademarks to identify merchandise that was not affiliated with Audi could dilute the distinctiveness of Audi's marks. *Id.* at 547.

In this case, unlike *Audi*, Defendants did not use Dow Corning's marks to label Defendants' products. They did not pretend that they were Dow Corning or that their products were authorized or sponsored by Dow Corning. Rather, Defendants used the Dow Corning mark in a descriptive manner to compare their products to Dow Corning products. Indeed, Defendants emphasized that their products and Dow Corning's products differed, even suggesting that their products would be better than Dow Corning's products because they would combine the best of several available

-20-

technologies.  Pls.' Compl. ¶ 47, 55; [Dkt. # 19-D].  Use of the Dow Corning mark in this manner cannot be said to "cause dilution of the distinctive quality of the [Dow Corning] mark."  *AutoZone, Inc.*, 373 F.3d at 802.

Moreover, such descriptive uses of the Dow Corning mark to compare Dow Corning's products with a competitor's products are specifically protected by the statute.  The "nominative or descriptive fair use . . . of a famous mark by another person *other than as a designation of source for the person's own goods or services*, including use in connection with— (I) advertising or promotion that permits consumers to compare goods or services" is not actionable as dilution.  15 U.S.C. § 1125(c)(3)(A).  In other words, unless the descriptive use of a mark suggests that the owner of the mark is the source of the goods—as in *Audi*—such a use of the mark is not actionable under the dilution statute.  Here, Plaintiffs allege that Defendants used the Dow Corning mark to identify the source of Little's experience, but they do not allege that the mark was used in a way that would suggest Dow Corning itself was the source of Defendants products.

There is a difference between Defendants' suggestion to their customers that they had acquired proprietary Dow Corning technology and were prepared to capitalize on that technology to develop Defendants' own products, and the assertion by the defendant in *Audi* that their products were actually affiliated with or sponsored by Audi.  While the latter is actionable under the dilution statute, the former is not.[4]  Plaintiffs' dilution claims will be dismissed.

---

[4] Defendants also contend that the dilution claim should be dismissed because the Dow Corning mark is not "famous."  "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  While Dow Corning's mark is certainly widely recognized by its industrial consumer base, it may not be widely recognized by the general consuming public.  The defense, although plausible, is fact based.  Dow Corning has alleged their marks are famous, and would be entitled to an opportunity to prove it.

-21-

### D.

Michigan law provides that misappropriation of trade secrets may be enjoined, and that a complainant may also be entitled to recover damages for the misappropriation. Mich. Comp. Laws §§ 445.1903–.1904. "Misappropriation" means either:

> (I) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[; or]
>
> (ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:
>
> > (A) Used improper means to acquire knowledge of the trade secret.
> >
> > (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.
> >
> > (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Mich. Comp. Laws § 445.1902(b). "Improper means" is defined to include "theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means." Mich. Comp. Laws § 445.1902(a). A "trade secret" is

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
> > (I) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> >
> > (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws § 445.1902(d).

Defendants contend that Plaintiffs' claim for misappropriation of trade secrets should be dismissed because they have not identified a specific trade secret that was misappropriated. *See Dura Global Techs., Inc. v. Magna Donnelly Corp.*, 662 F. Supp. 2d 855, 859 (E.D. Mich. 2009) (noting plaintiff must plead and prove the "specific nature" of the trade secret).

Plaintiffs allege that Dow Corning manufactures TCS, which in turn is used by Hemlock Semiconductor to manufacture polysilicon. Pls.' Compl. ¶¶ 17–21. Plaintiffs further allege that the

> basic processes involved in the manufacture of trichlorosilane and polysilicon include: the reduction of naturally occurring quartz rock into silicon; reaction of that silicon with anhydrous hydrogen chloride (HCl) to produce trichlorosilane; purification of the trichlorosilane; heating of the trichlorosilane in a reactor to cause the deposition of polysilicon (decomposition); and capture and conversion of by-product chlorosilanes into reusable trichlorosilane. Many steps are involved in these basic processes and very specific knowledge of proprietary equipment, specifications, conditions, temperatures, insulation, pressures, amounts, flows, timing, and capture of losses are necessary for the overall process to function properly and economically.
>
> Dow Corning and Hemlock Semiconductor have achieved success in the manufacture of trichlorosilane and polysilicon by painstakingly developing optimal methods, techniques, and processes over several decades. Dow Corning's and Hemlock Semiconductor's trade secrets allow them to achieve great efficiency in a capital-intensive industry and to produce extremely high purity products. These trade secrets are extraordinarily valuable, highly sought-after, and subject to extensive protective measures to ensure their continued secrecy.

*Id.* ¶¶ 22–23.

Plaintiffs have alleged the "specific nature" of their process for manufacturing TCS and polysilicon. *See Dura Global Techs., Inc.*, 662 F. Supp. 2d at 859. They have further alleged that those processes, and the specifications and conditions necessary to make them run efficiently, are trade secrets. *See* Mich. Comp. Laws § 445.1902(d) (providing that a "process" can be a trade secret). The complaint alleges sufficient factual information to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at

1949.

## E.

Pursuant to Michigan common law, "one has a duty to not engage in any conduct that is fraudulent or deceptive [which] tends to mislead the public." *Consol. Rail Corp. v. Grand Trunk W. R.R.*, No. 09-10179, 2009 WL 3460334 (E.D. Mich. Oct. 22, 2009) (citation and quotation omitted). The parties agree that the standards for pleading an unfair competition or false advertising claim under federal law are the same for pleading such a claim under state law. Accordingly, for the reasons explained above, Plaintiffs' complaint states a claim for unfair competition under Michigan law.

## F.

The Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.901–.922, prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." Mich. Comp. Laws § 445.903(1). " 'Trade or commerce' means the conduct of a business providing goods, property, or service *primarily for personal, family, or household purposes*." Mich. Comp. Laws § 445.902(d) (emphasis added). Neither Plaintiffs nor Defendants are engaged in "trade or commerce" as it is defined in the statute. Accordingly, the Michigan Consumer Protection Act is inapplicable to this case, and the consumer protection act claim will be dismissed. *See, e.g.*, *Computer Network, Inc. v. AM Gen. Corp.*, 696 N.W.2d 49, 60 (Mich. Ct. App. 2005) (concluding the Michigan Consumer Protection Act "does not supply protection where an item is purchased primarily for business or commercial purposes).

## G.

A claim for tortious interference with a contract under Michigan law requires "(1) the

-24-

existence of a contract, (2) breach of contract, (3) an unjustified instigation of the breach by the defendant." *Gering v. Fraunhofer USA, Inc.*, No. 05CV73458DT, 2006 WL 416118, at *2 (E.D. Mich. Feb. 21, 2006). Here, Plaintiffs allege that Defendants persuaded Little to breach his confidentiality agreements with Dow Corning by disclosing confidential information about Dow Corning's manufacturing processes. Defendants contend that the claim is preempted by the Michigan Uniform Trade Secrets Act, which provides that "this act displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Mich. Comp. Laws § 445.1908.

To the extent Plaintiffs seek a remedy for the alleged misappropriation of a trade secret, they are limited to the remedies provided by the Uniform Trade Secrets Act. However, Plaintiffs are also entitled to seek a remedy for the disclosure of confidential information protected by the agreements that does not consist of trade secrets. In other words, to the extent Little disclosed confidential information to Defendants and that information was not a "trade secret," Plaintiffs are entitled to seek redress for Defendants' tortious interference with Little's confidentiality contracts.

### III.

Defendants also allege that the claims against LXE Solar should be dismissed because the Court lacks personal jurisdiction over the company. The Court may exercise personal jurisdiction over an out-of-state defendant only after confirming that the state long-arm statute authorizes jurisdiction over the nonresident defendant, and that the exercise of personal jurisdiction would not deny the defendant its constitutional right to due process of law. *Reynolds*, 23 F.3d at 1115; *Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987); *see also* Mich. Comp. Laws §§ 600.715, .735 (Michigan's long-arm statutes). Here, the parties focus on the due process

requirement. *See Kriko v. Allstate Ins. Co. of Canada*, 357 N.W.2d 882, 883 (Mich. App. 1984) (noting that Michigan's long-arm statute provides the "full extent of power possible to gain personal jurisdiction over nonresident defendants as is consistent with the principles of due process"); *FFOC Co. v. Invent A.G.*, 882 F. Supp. 642, 654 (E.D. Mich. 1994) (noting Michigan's long-arm statute is "coterminous with the due process clause").

Pursuant to the Due Process Clause, a nonresident defendant may be subjected to general personal jurisdiction in Michigan regardless of whether the cause of action is related to the defendant's in-state activities if that defendant's contacts with the state are "continuous and systematic." *Helicopteros Nacionales de Colombia*, 466 U.S. at 414–15. The Court may also exercise personal jurisdiction over a specific cause of action if that cause of action "arises out of" specific contacts with the state. *Id.* Where a plaintiff seeks to establish personal jurisdiction through specific contacts related to the litigation, a court must find a basis to exercise jurisdiction over the defendant with respect to each individual claim. *Preferred RX, Inc. v. Am. Prescription Plan, Inc.*, 46 F.3d 535, 550–51 (6th Cir.1995). At this stage, Plaintiffs have the burden of setting forth a prima facie case for jurisdiction to avoid dismissal. *See Ford Motor Co. v. Great Domains, Inc.*, 141 F. Supp. 2d 763, 770 (E.D. Mich. 2001) (citing *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997)).

The parties apparently agree that the Court has general personal jurisdiction over LXEng and Xiao due to there extensive contacts with the State of Michigan. They disagree, however, about whether there is personal jurisdiction of LXE Solar. LXE Solar was incorporated in a foreign country and its principal place of business is in New Jersey. Plaintiffs do not allege that LXE Solar has any direct contacts with the State of Michigan. Rather, they allege that LXE Solar is the

"successor" to LXEng and the "alter ego" of Xiao, as a result, the fact that the Court has personal jurisdiction over LXEng and Xiao should be imputed to LXE Solar.  Pls.' Compl. ¶ 7.

> The Sixth Circuit has explained:

> federal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court.

*Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (quoting *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002)).

Plaintiffs have alleged that LXE Solar is the successor to LXEng.  They have further alleged that LXE Solar was created solely to insulate LXEng's assets from this litigation and the litigation with Little's estate about the value of the company.  As such, they have included sufficient factual information in their complaint to make a prima facie showing that this Court has personal jurisdiction over LXE Solar as a result of its close relationship with the other Defendants.  At the pleading stage, the burden on Plaintiffs to demonstrate personal jurisdiction is "relatively slight." *See Air Products & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (citation and quotation omitted).

## IV.

Accordingly, it is **ORDERED** that Defendants' motion to dismiss [Dkt. # 17] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Count II of Plaintiffs' complaint, alleging trademark infringement; Count IV of Plaintiffs' complaint, alleging trademark dilution; and Count VI of

Plaintiffs' complaint, alleging violation of the Michigan Consumer Protection Act, are **DISMISSED**

**WITH PREJUDICE**.  Counts I, III, V, and VI remain pending.


s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: May 20, 2011

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on May 20, 2011.

s/Tracy A. Jacobs
TRACY A. JACOBS