UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOW CORNING CORPORATION and
HEMLOCK SEMICONDUCTOR
CORPORATION,

       Plaintiffs,

v.

       Case Number 11-10008-BC
       Honorable Thomas L. Ludington

JIE XIAO, a/k/a Georg Xiao, LXENG,
LLC, and LXE SOLAR, INC.,

       Defendants/Third-Party Plaintiffs,

v.

KATHY LITTLE, Individually, and
as the Personal Representative of the
Estate of Michael Little,

       Third-Party Defendants.

_____ /

**OPINION AND ORDER GRANTING
PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIM AND GRANTING
THIRD-PARTY DEFENDANTS' MOTION TO DISMISS THIRD-PARTY COMPLAINT**

On January 3, 2011, Dow Corning Corp. and Hemlock Semiconductor Corp. (collectively, "Dow Corning") filed suit against Jie Xiao, LXEng LLC, and LXE Solar, Inc. (collectively, "LXE"), alleging that LXE stole Dow Corning's trade secrets and misused its trademarks in an effort to lure customers away from Dow Corning's trichlorosilane and polysilicon businesses. Specifically, the seven-count complaint asserted claims for: (1) misappropriation of trade secrets under Michigan law; (2) trademark infringement in violation of the Lanham Act; (3) false advertising, false representations, and unfair competition in violation of the Lanham Act; (4) trademark dilution in violation of the Lanham Act; (5) unfair competition

in violation of Michigan law; (6) violations of the Michigan Uniform Trade Practices Act; and (6) tortious interference with a contract in violation of Michigan law.  ECF No. 1.

LXE filed a motion to dismiss on January 26, 2011, contending that the federal claims should be dismissed because they do not state a claim for relief and that the state claims should be dismissed for lack of jurisdiction or on their merits.  ECF No. 17.  On May 20, 2011, the motion was granted in part and denied in part.  ECF No. 33.  The Court dismissed Dow Corning's claims for trademark infringement and trademark dilution in violation of the Lanham Act, as well as the claims for violation of the Michigan Consumer Protection Act.  The claims for false advertising, false representations, and unfair competition in violation of the Lanham Act, as well as misappropriation of trade secrets and tortious interference with contract in violation of Michigan law, were permitted to proceed.

On June 3, 2011, LXE filed a counterclaim and third-party complaint.  ECF No. 35.  The counterclaim asserted a single claim against Dow Corning for intrusion upon seclusion.  The third-party complaint asserted a right to indemnification against Kathy Little, individually and as personal representative of the estate of Michael Little.  Dow Corning and Mrs. Little now move to dismiss, respectively, the counterclaim and the third-party complaint.  ECF Nos. 44, 55. For the reasons explained below, the motions will be granted.

**I.**

Dow Corning Corp. is a Michigan corporation that manufactures silicon products, including trichlorosilane.  Pls.' Compl. ¶ 3.  It entered the polycrystalline silicon industry more than fifty years ago and has devoted substantial resources to developing its brand of polycrystalline silicon.  *Id.* ¶¶ 12–17.  In 1960, Dow Corning selected Hemlock, Michigan as the

site for its polysilicon plant, forming Hemlock Semiconductor in 1979. *Id.* ¶ 19. Hemlock Semiconductor now manufactures polysilicon using Dow Corning's trichlorosilane; Dow Corning remains the majority shareholder of Hemlock Semiconductor. *Id.* ¶ 4.

Michael Little was employed by Dow Corning for twenty five years as a chemical engineer. *Id.* ¶ 25. While employed by Dow Corning, Mr. Little manufactured both trichlorosilane and polysilicon. *Id.* Indeed, for a period of time Mr. Little served as the head of Dow Corning's trichlorosilane production facility in Midland, Michigan. *Id.* Mr. Little signed several contracts promising, inter alia, not to disclose "any trade secret, confidential know-how or confidential business or technical information of Dow Corning." *Id.* ¶ 26. In May 2002, Mr. Little left Dow Corning. *Id.* ¶ 25. Mr. Little's wife, Kathy Little, still works at Dow Corning, in its human resources department. Defs.' Third-Party Compl. ¶ 25.

In 2007, Dr. Xiao and Mr. Little formed LXEng, a limited liability company formed under the laws of Nevada. Pls.' Compl. ¶¶ 5–6. Each gentleman owned a fifty-percent interest in LXEng. *Id.* Although both gentlemen were chemists, Mr. Little had more expertise in the trichlorosilane and polysilicon industries — Dr. Xiao, before joining LXEng, worked in the pharmaceutical industry. *Id.* ¶ 29.

Shortly after LXEng was formed, the company secured contracts worth as much as $18.4 million to provide trichlorosilane and polysilicon technology to two companies, which are identified only as "Company A" and "Company B" in Dow Corning's complaint. *Id.* ¶ 33. LXEng also entered into negotiations with two additional companies, Dow Corning alleges, for two additional contracts worth as much as $12 million. *Id.* ¶ 34. During the course of negotiations with "Company C" and "Company D," Dow Corning alleges that Mr. Little and Dr.

Xiao disclosed Dow Corning trade secrets to their customers, including "specifications and characteristics of Dow Corning's fluid bed reactors." *Id.* ¶¶ 35–36. Dow Corning further alleges that Mr. Little, who was also a pilot and photographer, conducted aerial surveillance of Dow Corning's manufacturing facilities in Michigan and used that information to explain the processes to LXEng's prospective clients. *Id.* ¶ 37.

Mr. Little died unexpectedly in November 2007, when the single-engine plane he was flying crashed near Gladwin, Michigan. Pls.' Compl. ¶ 39. Dr. Xiao and LXEng then contacted other Dow Corning employees and placed advertisements in Michigan publications seeking to hire Dow Corning's employees with expertise in the trichlorosilane and polysilicon industries. *Id.* ¶¶ 42–43.

In March 2008, Dow Corning's counsel wrote a letter to LXEng, expressing concern that Mr. Little may have shared Dow Corning's trade secrets with LXEng and its customers and emphasizing Dow Corning's intent to "protect its trade secrets and other intellectual property rights." *Id*. ¶ 41. Dow Corning asked LXEng to consent to an independent inspection of a laptop computer that was used by Mr. Little before his death. *Id.* The request was refused. *Id.*

Around this time, Mr. Little's estate exercised an option to sell his ownership interest in LXEng back to the company, demanding $6,725,000 as the fair market value of the interest. *Id.* ¶ 50. LXE concedes that "[u]nder the operating agreement of LXEng, Mr. Little's Estate had a put right to obligate LXEng to buy out the Estate's interest." Defs.' Countercl. ¶ 6, ECF No. 35. Disagreement arose, however, over the fair market value of the share, in part because of the threat of potential liability to Dow Corning. *See id*. ¶¶ 6–7.

Also around this time, Dr. Xiao was approached by Woongjin Polysilicon Co., Ltd. *See* Defs.' Third-Party Compl. ¶ 7, ECF No. 35. LXE explains: "To keep this new contract free of any possible liabilities of LXEng caused by Michael Little," *id.*, Dr. Xiao formed LXE Solar in the Caribbean nation of Nevis, placing the new company's assets in a bank account in the Republic of Seychelles. *Id.* ¶ 7; *see also* Pls.' Compl. ¶ 52. Dr. Xiao is the only shareholder of LXE Solar and Dow Corning asserts that LXE Solar is the "successor to LXEng and the alter ego of Xiao." Pls.' Compl. ¶ 7. Shortly after LXE Solar's formation, it secured a $10 million contract with Woongjin. *Id.* ¶ 54.

The government of Seychelles, however, froze the LXE Solar account and alerted U.S. Authorities. Defs.' Third-Party Compl. ¶¶ 7, 12. The FBI began a criminal investigation and a grand jury empanelled in the Southern District of Florida issued subpoenas for documents and electronic information held by LXE. *Id.* ¶ 12. Sometime later, the FBI contacted Dow Corning and invited them to view the documents suspected of containing Dow Corning's trade secrets. *Id.* ¶ 15. Eventually, the Seychelles account was released. *Id.* ¶ 11. The grand jury has not indicted Dr. Xiao, LXEng, or LXE Solar. *Id.* ¶ 13.

In February 2009, Mrs. Little brought suit on behalf Mr. Little's estate against Dr. Xiao and LXEng in a New Jersey state court, seeking to enforce the estate's right to sell Mr. Little's share of LXEng. *See* Defs.' Opp'n Mot. Dismiss Third-Party Compl. 3, ECF 55 ("Defs.' Opp'n Little Mot."). Xiao and LXEng moved to compel arbitration based on a provision in the LXEng operating agreement which required issues of valuation be submitted to arbitration. *See id.* Ex. 3 § 8.4 (LXEng operating agreement). The operating agreement provides in pertinent part: "In the event that the parties are unable to agree upon a third-party appraiser, the matter of valuation

shall be submitted to binding arbitration in New York, New York, pursuant to the rules of the American Arbitration Association . . . ." *Id.* Dr. Xiao and LXEng filed an arbitration demand with the American Arbitration Association in August 2009. On April 28, 2010, they filed an amended arbitration demand which stated, inter alia, that "Dow Corning, Michael Little's former employer, has claimed that he misappropriated the solar technology from them. This cloud on title further depreciates the value of LXEng." Third-Party Defs.' Reply Mot. Dismiss Third-Party Compl. Ex. 3, at 3, ECF No. 62 ("Little Reply"). "The claims by Dow Corning against LXEng could bankrupt LXEng," the amended arbitration demand added, and so sought to expand the scope of the arbitration beyond simply valuing the estate's membership interest. *Id.* at 4. Mrs. Little initially opposed the demand to expand the scope of arbitration; however, two months later she agreed to arbitrate "the entire dispute between the parties." Defs.' Opp'n Little Mot. Ex. 1 (Amended Arbitration Agreement), ECF 55-2; *see also* Little Reply Ex. 1 (same), ECF No. 62-2. The parties executed an arbitration agreement titled "Stipulated Agreement as to Scope of Arbitration" which stated:

> The attorneys for the undersigned parties hereby agree on behalf of their respective clients that the entire dispute between the parties, including all claims and counterclaims (including those claims and counterclaims now pending in the Superior Court, *Kathy Little, et al. v. Jie Xiao, et al.*, Case No. C-29-09 (N.J. Sup. Ct. Morris County), which shall be discontinued by stipulation) shall be submitted to the Panel for determination and resolution in the binding arbitration, *Jie Xiao and LXEng LLC v. The Estate of Michael D. Little and Kathy Little, Personal Representative*, No. 13 198 Y 02259 09, Louis A. Craco, Stephen J. Savva and Malcolm R. Schade presiding as arbitrators. Claimants Jie Xiao and LXEng LLC's Amended Arbitration Demand dated April 28, 2010 shall be permitted to be filed, and Respondents, the Estate of Michael D. Little and Kathy Little, Personal Representative, shall have the right to file an answering statement and counterclaims within 30 days of today's date. The award rendered by the Panel shall be final and binding and in accordance with the Federal Arbitration Act enforceable in a court of competent jurisdiction.

*Id*.

A little less than six months later, Dow Corning filed suit against LXE. After LXE's motion to dismiss the complaint was granted in part and denied in part, LXE filed a counterclaim against Dow Corning and a third-party complaint against Mrs. Little, individually and in her capacity as the personal representative of her late husband's estate. *See* Defs.' Answer, Countercl., Third-Party Compl., ECF No. 35.

In the counterclaim, LXE alleges that Dow Corning's suit "is based upon a wrongful agreement and conspiracy between the FBI and Plaintiffs, pursuant to which the FBI agreed to provide Plaintiffs with access to information obtained in a grand jury investigation." Defs.' Countercl. ¶ 18. Specifically, LXE alleges, "the FBI, after the grand jury had made no determination to indict Defendants, agreed with representatives of Plaintiffs to allow Plaintiffs access to the information obtained by the grand jury." *Id*. ¶ 17. This information, LXE writes, included "secret and private information"; specifically, LXE's "trade secrets, confidential business information, private communications, and technical data." *Id*. ¶ 21. "Although the FBI may have obtained this confidential information lawfully," LXE argues, "the FBI's agreement with Plaintiffs to provide Plaintiffs with portions of documents to quote in a civil action was in direct violation of applicable state and federal law." *Id*. ¶ 23. LXE concludes: "Plaintiffs committed the tort under Michigan common law of invasion of privacy based upon Plaintiffs' intrusion upon Defendants' seclusion." *Id*. ¶ 24.

In the third-party complaint, LXE seeks indemnification from Mrs. Little, individually and in her capacity as the personal representative of her late husband's estate. It is entitled to

indemnification from the estate, LXE alleges, because "to the extent that [LXE] may ultimately be found liable on any claim of [Dow Corning] regarding wrongful use of [Dow Corning's] trade secrets or confidential information, [LXE] contend[s] that the wrongdoing and fault would be entirely that of Michael Little." Defs.' Third-Party Compl. ¶ 8. Likewise, LXE alleges, it is entitled to indemnification from Mrs. Little in her individual capacity because she is "jointly liable as a co-conspirator and as an aider and abettor for any such wrongful conduct." *Id.* ¶ 29. Moreover, the estate's assets were conveyed to her "without equivalent consideration in return." *Id.* ¶ 10.

Dow Corning and Mrs. Little now move to dismiss, respectively, the counterclaim and the third-party complaint. As explained in greater detail below, the counterclaim against Dow Corning will be dismissed because the receipt of information already lawfully in the hands of a third-party does not establish a prima facie case of intrusion upon seclusion. The third-party complaint against Mrs. Little will be dismissed because LXE and Mrs. Little have agreed to submit their "entire dispute" to arbitration.

## II.

### A.

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (2009) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the [party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555–56). A court must accept all factual content in the pleading as true, however, "the tenet that a court must accept as true all of the allegations contained in a [pleading] is inapplicable to legal conclusions." *Iqbal*, 129 S. Ct. at 1949. Moreover, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. . . . When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950.

**B.**

"Michigan law has long recognized a common-law right to privacy." *Baggs v. Eagle-Picher Indus., Inc.*, 957 F.2d 268, 273 (6th Cir. 1992) (citing *De May v. Roberts*, 9 N.W. 146 (Mich. 1881)). Presently, the common law of Michigan recognizes four distinct theories of invasion of privacy: "(1) the intrusion upon another's seclusion or solitude, or into another's private affairs; (2) a public disclosure of private facts about the individual; (3) publicity that places someone in a false light in the public eye; and (4) the appropriation of another's likeness

for the defendant's advantage." *Begin v. Mich. Bell Tel. Co.*, 773 N.W.2d 271, 286 (Mich. Ct. App. 2009) (quoting *Lewis v. LeGrow*, 670 N.W.2d 675, 687 (Mich. Ct. App. 2003)). In this case, LXE brings its counterclaim on the first theory — intrusion upon seclusion. *See* Defs.' Countercl. ¶ 24.

"An action for intrusion upon seclusion focuses on the manner in which information is obtained, not its publication; it is considered analogous to a trespass." *Begin*, 773 N.W.2d at 286 (quoting *Doe v. Mills*, 536 N.W.2d 824, 832 (Mich. Ct. App. 1995)); *see generally Restatement (Second) of Torts* § 652B (1977) ("One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."). A prima facie case of intrusion upon seclusion has three elements: "(1) the existence of a secret and private subject matter; (2) a right possessed by the plaintiff to keep that subject matter private; and (3) the obtaining of information about that subject matter through some method objectionable to a reasonable man." *Begin*, 773 N.W.2d at 286 (quoting *Mills*, 536 N.W.2d at 832).

In this case, Dow Corning argues that LXE's counterclaim does not plausibly allege any of the three elements. As the argument regarding the third element conclusively resolves the matter, it is taken up first.

Under Michigan common law, a defendant is not liable for merely receiving information that has been tortiously obtained by another, even if the defendant has knowledge of the impropriety of the initial intrusion. *See, e.g.*, *Mills*, 536 N.W.2d at 832–33. In *Mills*, for example, the plaintiffs alleged that the defendant had tortiously intruded on their seclusion by

obtaining information about the plaintiffs' intent to undergo abortions from a garbage dumpster in the clinic's parking lot. *Id.* at 832. The plaintiffs, acknowledging that a third-party initially obtained the information, not the defendant, nevertheless argued "that liability still may be imposed under an intrusion theory because [the defendant] admitted in her deposition that she was aware of the source of the information . . . ." *Id.* at 833. The trial court summarily dismissed this argument and the Michigan Court of Appeals affirmed. *Id.* In support of its ruling, the court cited *Pearson v. Dodd*, 410 F.2d 701 (D.C. Cir. 1969), in which the plaintiff similarly sought to hold the defendants liable for the receipt of information from a third-party who, in turn, had obtained the information through an improper intrusion. *See Mills*, 536 N.W.2d at 833 (citing *Dodd*, 410 F.2d at 704–05). Summarily dismissing the claim in *Dodd*, Judge Skelly Wright wrote:

> Although appellee's complaint charges that appellants aided and abetted in the removal of the documents, the undisputed facts . . . established only that appellants received copies of the documents knowing that they had been removed without authorization. If we were to hold appellants liable for invasion of privacy on these facts, we would establish the proposition that one who receives information from an intruder, knowing it has been obtained by improper intrusion, is guilty of a tort. In an untried and developing area of tort law, we are not prepared to go so far. A person approached by an eavesdropper with an offer to share in the information gathered through the eavesdropping would perhaps play the nobler part should he spurn the offer and shut his ears. However, it seems to us that at this point it would place too great a strain on human weakness to hold one liable in damages who merely succumbs to temptation and listens.

410 F.2d at 705 (footnote omitted), *quoted in part in Mills*, 536 N.W.2d at 833. The Michigan Court of Appeals in *Mills*, decided twenty-six years after *Dodd*, was similarly unwilling to impose liability on a defendant for a third-party's initial intrusion, writing: "This rationale is directly applicable to the instant case and persuades us that [the defendant's] mere receipt of the

-11-

information from [a third-party], even with knowledge of its source, is insufficient to subject her to liability under an intrusion theory." 536 N.W.2d at 833; *see also Doe v. Peterson*, No. 2:09-cv-13138, 2011 WL 1515029, at *10 (E.D. Mich. March 24, 2011) (holding operators of website which posted explicit pictures of persons without their consent were not liable for intrusion upon seclusion under Michigan law, since operators received images already obtained by third-parties).

In this case, LXE concedes that "the FBI may have obtained this confidential information lawfully." Defs.' Countercl. ¶ 23. But, LXE alleges, "the FBI, after the grand jury had made no determination to indict Defendants, agreed with representatives of Plaintiffs to allow Plaintiffs access to the information obtained by the grand jury." *Id.* ¶ 17. Thus, by LXE's own admission, the information had already been received by the FBI before it was shown to Dow Corning. Like the defendants in *Mills* and *Dodd*, Dow Corning cannot be held liable for the mere receipt of information already in the hands of a third-party. *See Dodd*, 410 F.2d at 705; *Mills*, 536 N.W.2d at 833.[1]

LXE attempts to distinguish *Mills* on three grounds. *See* Defs.' Br. Opp'n Mot. Dismiss Countercl. 18–19, ECF No. 56. Each, however, is a distinction without a difference. First, LXE argues, *Mills* is distinguishable because "[i]n *Mills*, there was no evidence showing that either defendant was involved along with the [dumpster-diving non-party] Thomas in obtaining the information from the garbage. By contrast, here, [Dow Corning was] necessarily involved in the

---

[1] Indeed, this case is less complicated than *Mills* and *Dodd*. In both of those cases, the courts assumed that the third parties had initially obtained the information in a tortious manner — yet the courts nevertheless refused to impose liability on the recipient of the tortiously obtained information. *See Dodd*, 410 F.2d at 704–05; *Mills*, 536 N.W.2d at 832–33. In this case, LXE does not argue that the FBI obtained the information in a tortious manner — indeed, LXE concedes that the FBI obtained the information lawfully. *See* Defs.' Countercl. ¶ 23 (quoted *supra*).

wrongful obtaining of the information (by their agreement with the FBI to copy and/or quote from the documents)." *Id*. at 19 (internal quotation marks omitted); *see also* Defs.' Countercl. ¶ 18 (alleging that Dow Corning's suit "is based upon a wrongful agreement and conspiracy between the FBI and Plaintiffs, pursuant to which the FBI agreed to provide Plaintiffs with access to information obtained in a grand jury investigation").

As a threshold matter, of course, the Supreme Court recently made plain in *Twombly* that "a bare assertion of conspiracy will not suffice" to survive a 12(b)(6) motion. 550 U.S. at 556; *see also Garback v. Lossing*, No. 09-cv-12407, 2010 WL 3733971, at *7 (E.D. Mich. September 20, 2010) (dismissing an intrusion on seclusion claim because "the complaint contains only legal conclusions, while lacking well-pleaded allegations with respect to conspiracy").

Assuming, arguendo, that LXE's counterclaim sets forth sufficient facts to plausibly allege an agreement between the FBI and Dow Corning to share the information, it nevertheless does not state a claim for conspiracy to commit intrusion on seclusion because the alleged agreement occurred only after the FBI had acquired the information. *See* Countercl. ¶ 17 (quoted *supra*). As *Mills* and *Dodd* made plain, to hold a defendant liable for conspiracy to commit intrusion upon seclusion, the defendant must have conspired or aided and abetted in the initial removal of the documents. LXE's counterclaim does not allege that Dow Corning conspired with the FBI in the initial acquisition of the information.[2]

---

[2] This is not a case in which a defendant is alleged to have initially conspired with a law enforcement agency to trump up charges against a competitor and deliberately utilize the grand jury subpoena to acquire sensitive proprietary information. The Court expresses no opinion on what the result would be had such an agreement existed before the law enforcement agency initially obtained the information, as that case is not before this Court.

LXE next attempts to distinguish *Mills* because "[c]rucially, *Mills* was decided on summary judgment, after discovery had revealed the absence of evidence to support the intrusion claim." Defs.' Br. Opp'n Mot. Dismiss Countercl. 19. The defect in LXE's counterclaim, however, is not a proof problem — LXE's factual allegations are accepted as true for purposes of deciding a 12(B)(6) motion to dismiss. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Rather, the defect in the counterclaim is a problem of substantive law — under Michigan common law, a party is not liable for the mere receipt of information already in the hands of a third-party. *See Mills*, 536 N.W.2d at 833. Accepting all of LXE's factual allegations as true, its counterclaim does not state a claim on which relief can be granted because it does not allege that Dow Corning conspired with the FBI in the initial acquisition of the information.

Finally, LXE argues that "*Mills* is not controlling because the intrusion claim here is not based on the publication of [LXE's] information, but rather on how that information was obtained." Defs.' Br. Opp'n Mot. Dismiss Countercl. 19. LXE is correct that in *Mills* the court rejected the plaintiff's publication theory, explaining "[a]n action for intrusion upon seclusion focuses on the manner in which information is obtained, not its publication." 536 N.W.2d at 832 (citing *Tobin v. Civil Serv. Comm.*, 331 N.W.2d 184, 189 (Mich. 1982)). The court went on, however, to consider the plaintiffs' argument "that a cause of action for intrusion exists because the evidence shows that the information about plaintiffs was obtained from a garbage dumpster [by a third-party]." 536 N.W.2d at 832. And, the court concluded in *Mills*, the defendant was not liable for intrusion because she did not participate in the initial acquisition of the information. *Id.*

-14-

In sum, the motion to dismiss the counterclaim will be granted because the receipt of information already lawfully in the hands of a third-party does not establish a prima facie case of intrusion upon seclusion.

### III.

Mrs. Little, individually and on behalf of her late husband's estate, moves to dismiss the third-party complaint pursuant to both Federal Rules of Civil Procedure 12(B)(1) and 12(B)(6). As her Rule 12(B)(1) argument is dispositive of the motion before the Court, it is taken up first.

### A.

Rule 12(b)(1) motions "fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Facial attacks, like Rule 12(b)(6) motions, challenge the sufficiency of the pleading itself; in evaluating facial attacks, the court must accept the factual allegations as true and construe them in the light most favorable to the nonmoving party. *Id*. A factual attack, in contrast, challenges "the factual existence of subject matter jurisdiction. On such a motion, no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id*. (citation omitted) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). When subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion. *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

### B.

The Federal Arbitration Act, 9 U.S.C. § 1 et seq., which applies to arbitration agreements involving interstate commerce, creates "a liberal federal policy favoring arbitration agreements."

*Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 411 F.3d 669, 672 (6th Cir. 2005) (quoting *Moses H. Cone Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also Perry v. Thomas*, 482 U.S. 483, 489 (1987) (noting the Act "embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of a contract evidencing interstate commerce"). "By its terms, the Act leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 213 (1985) (emphasis in original).

Of course, "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 648–49 (1986)). Fundamentally, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). "Before compelling an unwilling party to arbitrate," the Sixth Circuit cautions, "the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003) (citing *AT&T Techs.*, 475 U.S. at 649). Crucially, however, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Alticor*, 411 F.3d at 672–73 (quoting *Moses H. Cone Hosp.*, 460 U.S. at 24–25).

Here, LXE does not dispute that a valid agreement to arbitrate exists between the parties; rather, LXE argues that the subject matter of its third-party complaint falls within the substantive scope of the agreement.[3]  Because of the plain language of the arbitration agreement and the strong federal policy favoring arbitration, LXE's argument is unpersuasive.

The text of the arbitration agreement provides that "the entire dispute between the parties" shall be submitted to arbitration.  Defs.' Opp'n to Little Mot. Ex. 1; Little Reply Ex. 1, ECF No. 62.  This language, of course, contains no limitations on the substantive scope of the arbitration.  Rather, in unqualified terms the agreement provides that the scope of the arbitration is "the entire dispute between the parties."  *Id*.

LXE, however, argues that it necessarily has an implicit "temporal limitation."  Defs.' Br. Opp'n Little Mot. 10, ECF No. 61 ("Defs.' Br.").  According to LXE, properly read the scope of the arbitration agreement is "the entire dispute [as of the date the arbitration agreement was executed, and only as to specific issues expressly raised on or before that date]."  *See id*. at 9–10.  LXE writes:  "The obvious intent of the parties in the Stipulation was to resolve the dispute regarding the arbitrability of issues that had been raised at the time of signing the Stipulation."

---

[3] As an aside, it should be noted that LXE Solar was not a formal party to the arbitration agreement. However, as LXE's brief concedes, if Dow Corning prevails in the underlying litigation, "LXE Solar will be treated as being identical to LXEng — there will be a complete piercing of the corporate veil." Defs.' Br. Opp'n Little Mot. 14.  Thus, a necessary predicate to any right to indemnification on the part of LXE Solar is a finding that it does not have a separate corporate existence from Dr. Xiao and LXEng.

Indeed, save for in a single footnote, LXE's brief does not even raise the defense that LXE Solar is not a party to the arbitration agreement.  *See id*. 13 n.4.  And, as LXE itself recognizes, it is only if "there is an identity of interest between LXE Solar and LXEng" that LXE Solar will have "standing to pursue the same claims [for indemnification] as LXEng." *Id*. at 14.  Consequently, although not formally a party to the arbitration agreement, its rights to indemnification are inextricably entwined with Dr. Xiao and LXEng, who are, of course, both parties to the arbitration agreement.  Put differently, its dispute with Mrs. Little, if any, is their dispute. And, for the reasons discussed below, their dispute must be arbitrated.

*Id*. at 9.  LXE reiterates: "The existing 'entire dispute' was the particular object that the parties had in view."  *Id*.  This argument, however, is contrary to both the law and the facts.

As a matter of law, "[t]he intent of the parties is best determined by the plain language of the contract."  *United States v. Donovan,* 348 F.3d 509, 512 (6th Cir. 2003) (citing *United States v. Hodgekins*, 28 F.3d 610, 614 (7th Cir. 1994)).  In this case, the arbitration agreement states that the parties agree to submit the "entire dispute" to arbitration — nothing limits the scope to issues that had already been expressly raised at the time the agreement was executed.  And, as noted above, the Supreme Court has unequivocally stated that "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Hosp.*, 460 U.S. at 24–25, *quoted in Alticor*, 411 F.3d at 672–73.

Moreover, as a factual matter, the threat of potential liability to Dow Corning was one of the causes of the dispute between Mrs. Little and LXE.  The parties' dispute arose because they could not agree on a fair market value price of Mr. Little's interest in LXEng — and they could not agree on a price, in part, because of the threat of potential liability to Dow Corning.  *See* Defs.' Countercl. ¶¶ 6–7.  Indeed, LXE candidly acknowledges that its "Amended Demand [for arbitration] referred to a potential threat of litigation by Dow Corning as depressing the value of LXEng as of the valuation date."  Defs.' Br. 5.  Thus, as a factual matter, the parties were conscious of the threat of liability to Dow Corning at the time the arbitration agreement was executed. LXE may be correct that its "mention of potential liability to Dow Corning which could have had an effect on the value of LXEng [in its amended demand for arbitration] . . . does not equate to raising the actual issues of fault and percentage of responsibility for alleged trade secret misappropriation."  *Id*. at 10.  But the plain language of the arbitration agreement does not

limit its scope to issues actually raised in the demand or answer. Rather, it states "the entire dispute between the parties" shall be submitted to arbitration. LXE's attempt to limit its scope to issues expressly raised at the time the arbitration agreement was executed is contrary to the plain language of the agreement.

Similarly unpersuasive is LXE's argument that the allocation of potential liability to Dow Corning cannot be arbitrated because the issue will not be ripe until there is a finding of actual liability (or lack thereof) in the underlying action in this Court. *Id*. at 10. Indeed, LXE's ripeness argument is contradicted by its own brief, in which it concedes: "If Mrs. Little desired that issues such as Third-Party Plaintiffs' claims for indemnification and contribution would be determined in the Arbitration, she had an easy opportunity to obtain that result."[4] *Id*. at 7 n.1. LXE elaborates: "Now, on the eve of the Arbitration hearing, it is neither authorized nor practical to insert new claims." *Id*. Neither argument is persuasive. First, for the reasons discussed above, the arbitration panel is "authorized" to hear the "entire dispute between the parties." The greater power of hearing the "entire dispute" authorizes the lesser dispute of hearing a component issue. *Cf. Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 345–346 (1986) ("[T]he greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling."). And second, whether LXE finds it "practical" to arbitrate the indemnification claim is irrelevant to the task

---

[4] As an aside, LXE may be correct that declaratory judgments regarding potential liability for indemnification are not cognizable in Michigan courts. However, LXE has not suggested, much less produced authority for the proposition a similar limitation applies to arbitration proceedings. And, of course, the arbitration agreement does not state that its scope is limited to claims presently cognizable in Michigan courts — it states that the scope is the "entire dispute" between the parties. Moreover, if the panel of arbitrators decides that the indemnification issue is not ripe for resolution, it may choose to stay the proceedings. And, as Plaintiff notes, the panel recently denied LXE's motion to stay the proceedings pending this litigation. *See* Little Mot. Exs. 5–6.

before this Court, which is simply to determine whether "the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Sec., Inc*., 315 F.3d 619, 624 (6th Cir. 2003). As the parties agreed to submit the "entire dispute" to arbitration, the specific dispute regarding indemnification falls within the substantive scope of that agreement.

The court will grant Mrs. Little's motion to dismiss the third-party complaint. Because the Court will grant Mrs. Little's motion to dismiss pursuant to Rule 12(B)(1), the Court does not reach her Rule 12(B)(6) arguments.

**IV.**

Accordingly, it is **ORDERED** that Plaintiffs' motion to dismiss the counterclaim (ECF No. 44) is **GRANTED**.

It is further **ORDERED** that Third-Party Defendants' motion to dismiss the third-party complaint (ECF No. 55) is **GRANTED**.

It is further **ORDERED** the hearing scheduled for September 20, 2011, at 3:00 p.m. is **CANCELED** because the parties' papers provide the necessary factual and legal information to decide the motion. *See* E.D. Mich. L.R. 7.1(f)(2).

Dated: September 19, 2011  /s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 19, 2011.

s/Tracy A. Jacobs
TRACY A. JACOBS