UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOW CORNING CORPORATION and
HEMLOCK SEMICONDUCTOR
CORPORATION,

      Plaintiffs,

v.

JIE XIAO, a/k/a Georg Xiao, LXENG,
LLC, and LXE SOLAR, INC.,

                                      /

Case Number 11-10008-BC
Honorable Thomas L. Ludington

**OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION TO COMPEL**

In this trade secrets case, Dow Corning Corp. and Hemlock Semiconductor Corp. have brought suit against Jie Xiao, LXE Solar, Inc., and LXEng LLC. Alleging misappropriation of trade secrets, Plaintiffs contend that Defendants used the misappropriated information to lure customers away from Plaintiffs' trichlorosilane and polysilicon businesses. In particular, Plaintiffs allege that Defendants misappropriated Plaintiffs' trade secrets regarding "first generation" fluid bed reactor technology (those secrets used in designing Plaintiffs' facility in Michigan) and used them in several multi-million dollar contracts with foreign firms.

The present dispute centers on whether Defendants may compel the disclosure of Plaintiffs' trade secrets regarding subsequent generations of fluid bed reactor technology (those used, for example, in designing Plaintiffs' facilities in Tennessee and China). Moving to compel disclosure, Defendants assert that this information is relevant for determining whether the first generation trade secrets have been rendered obsolete by the subsequent generations. Defendants explain, "Obsolete information cannot constitute a trade secret because the information has no

economic value." Defs.' Mot. to Compel 12 (quoting *Fox Sports Net North, LLC v. Minnesota Twins P'ship*, 319 F.3d 329, 336 (8th Cir. 2003)). Additionally, Defendants move to compel production of all other documents "concerning Plaintiffs' use of fluid bed reactors in the production of trichlorosilane."

Defendants are correct that trade secrets regarding subsequent generations of fluid bed reactor technology may be relevant to valuing the trade secrets at issue. Mere relevance, however, is not sufficient to compel disclosure of trade secrets. The moving party must show the information sought is both relevant and "necessary." *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 269 (6th Cir. 2010). The Sixth Circuit cautions, moreover, that courts must also balance "whether the need outweighs the harm of disclosure." *Id*. (quoting *Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 326 (10th Cir. 1981)).

Defendants do not demonstrate that they need the trade secrets requested. As a general matter, subsequent generations of technology do not necessarily render the prior generations obsolete. ("Obsolete" in this context means "information has no economic value." Defs.' Mot. 12 (quoting *Fox Sports Net*, 319 F.3d at 336)). Rather, multigenerational product diffusion is a relatively common marketing and production strategy.[1] Apple, for example, simultaneously sells several generations of the iPhone. The availability of the iPhone 4S does not render the trade secrets associated with the iPhone 4 of "no economic value."

---

[1] *See, e.g.*, John A. Norton & Frank M. Bass, *A Diffusion Theory Model of Adoption and Substitution for Successive Generations of High-Technology Products*, 33 Management Sci. 1069, 1069 (1987) ("As the time interval between technologies decreases the importance of understanding the impact of recent technologies on earlier ones increases. No matter what their advantages, newer technologies are not adopted by all potential buyers immediately. Rather, a diffusion process is set into motion. . . . These substitution effects will ultimately diminish the potential, if not the actual sales, of earlier technologies.").

Plaintiffs utilize several generations of fluid bed reactor technology. Demonstrating that subsequent generations of the fluid bed reactor technology are in use, however, will not necessarily establish that the trade secrets associated with the first generation technology had no economic value during period of time relevant to this action. The only thing that will necessarily determine obsolescence is whether some firm was willing to pay for the first generation technology during the period of time relevant to this action. Defendants have not demonstrated that the trade secrets sought are necessary to their case.

As Defendants have not demonstrated a need for the requested trade secrets, they are not entitled to discover this information. Defendants are, however, entitled to discover other relevant documents concerning Plaintiffs' use of fluid bed reactors in the production of trichlorosilane. Accordingly, the Court will grant Defendant's motion in part and deny it in part.

# I

## A

Dow Corning manufactures polysilicon products, including trichlorosilane. Pls.' Compl. ¶¶ 12–17, ECF No. 1. In 1960, Dow Corning selected Hemlock, Michigan as the site for its polysilicon plant, forming Hemlock Semiconductor in 1979. *Id.* ¶ 19. Hemlock Semiconductor now manufactures polysilicon using Dow Corning's trichlorosilane; Dow Corning remains the majority shareholder of Hemlock Semiconductor. *Id.* ¶ 4. Fluid bed reactors are used in the production of trichlorosilane. *Id.* ¶ 27.

Michael Little was employed by Dow Corning for twenty five years as a chemical engineer. *Id.* ¶ 25. While employed by Dow, Mr. Little was involved in the manufacture of both trichlorosilane and polysilicon. *Id.* "In particular, Little learned certain process specifications and process design techniques including . . . the specifications and characteristics for Dow

Corning's fluid bed reactors." *Id.* ¶ 27. For a period of time, Mr. Little served as the leader of Dow Corning's trichlorosilane production facility in Michigan. *Id.* Mr. Little also signed several contracts promising not to disclose "any trade secret, confidential know-how or confidential business or technical information of Dow Corning." *Id.* ¶ 26.

In May 2002, Mr. Little left Dow Corning. *Id.* ¶ 25. In 2007, Dr. Xiao and Mr. Little formed LXEng, a limited liability company formed under the laws of Nevada. Pls.' Compl. ¶¶ 5–6. Each gentleman owned a fifty-percent stake in LXEng. *Id.* Although both gentlemen were chemists, only Mr. Little had expertise in the trichlorosilane and polysilicon industries — Dr. Xiao, before joining LXEng, worked in the pharmaceutical industry. *Id.* ¶ 29.

Dow Corning alleges that shortly after LXEng was formed, it secured contracts worth as much as $18.4 million to provide trichlorosilane and polysilicon technology to two companies. *Id.* ¶ 33. LXEng also entered into negotiations with two other companies for contracts worth as much as $12 million. *Id.* ¶ 34. During the course of negotiations with these companies, Plaintiffs allege, Mr. Little and Dr. Xiao disclosed Plaintiffs' trade secrets to Defendants' customers, including the specifications and characteristics of Dow Corning's first generation fluid bed reactors. *Id.* ¶¶ 35–36. Plaintiffs further allege that Mr. Little, who was also a pilot and photographer, conducted aerial surveillance of Plaintiffs' manufacturing facility in Michigan and used that information to explain the processes to LXEng's prospective clients. *Id.* ¶ 37.

Mr. Little died unexpectedly in November 2007, when the single-engine plane he was flying crashed near Gladwin, Michigan. Pls.' Compl. ¶ 39. Dr. Xiao and LXEng then placed advertisements in Michigan publications seeking to hire Plaintiffs' employees with expertise in the trichlorosilane and polysilicon industries; they also contacted Plaintiffs' employees with similar expertise. *Id.* ¶¶ 42–43.

In March 2008, Dow Corning's counsel wrote a letter to LXEng, expressing concern that Mr. Little may have shared Dow Corning's trade secrets with LXEng and its customers and emphasizing Dow Corning's intent to "protect its trade secrets and other intellectual property rights." *Id*. ¶ 41. Dow Corning asked LXEng to consent to an independent inspection of a laptop computer that was used by Mr. Little before his death. *Id.* The request was refused. *Id.*

Around this time, Dr. Xiao was approached by Woongjin Polysilicon Co., Ltd. *See* Defs.' Third-Party Compl. ¶ 7, ECF No. 35. "To keep this new contract free of any possible liabilities of LXEng caused by Michael Little," *id*., on July 9, 2008, Dr. Xiao formed LXE Solar in the Caribbean nation of Nevis, placing the new company's assets in a bank account in the Republic of Seychelles. *Id.* ¶ 7. Dr. Xiao is the only shareholder of LXE Solar. Less than a month after LXE Solar's formation, it secured a $10 million contract with Woongjin.

The government of Seychelles then froze the LXE Solar account and alerted U.S. authorities. Defs.' Third-Party Compl. ¶¶ 7, 12. The FBI began a criminal investigation and a grand jury empanelled in the Southern District of Florida issued subpoenas for documents and electronic information held by Defendants. *Id*. ¶ 12. Sometime later, the FBI contacted Dow Corning and invited them to view the documents suspected of containing Dow Corning's trade secrets. *Id*. ¶ 15. Eventually, the Seychelles account was released. *Id*. ¶ 11. The grand jury has not indicted Dr. Xiao, LXEng, or LXE Solar. *Id*. ¶ 13.

**B**

In January 2011, Plaintiffs filed a seven-count complaint against Defendants alleging claims for misappropriation of trade secrets under Michigan law; trademark infringement in violation of the Lanham Act; false advertising, false representation, and unfair competition in violation of the Lanham Act; trademark dilution in violation of the Lanham Act; unfair

-5-

competition in violation of Michigan law; violations of the Michigan Uniform Trade Practices Act; and tortious interference with a contract in violation of Michigan law.

The same month, Defendants moved to dismiss the complaint. ECF No. 17. Granting the motion in part and denying it in part, the Court dismissed Plaintiffs' trademark claims and Michigan Consumer Protection Act claims, but permitted the trade secret, unfair competition, and tortious interference claims to proceed. *Dow Corning v. Xiao*, No. 11-10008, 2011 WL 2015517 (E.D. Mich. May 20, 2012).

Defendants then filed a counterclaim against Plaintiffs and a third-party complaint against Mrs. Little, individually and in her capacity as the personal representative of her late husband's estate. ECF No. 35. After Plaintiffs and Third-Party Defendant moved to dismiss, the Court issued an opinion and order dismissing the counterclaim and third-party complaint. *Dow Corning v. Xiao*, No. 11-10008, 2011 WL 4360082 (E.D. Mich. Sept. 19, 2012).

In August 2011, a stipulated protective order was entered. ECF No. 60. It permits the parties to designate as "confidential" any disclosure that the party "believes in good faith to contain competitively sensitive, proprietary, or confidential business information." Protective Order 3. Additionally, a party may designate as "attorneys' eyes only" a disclosure that the party "believes in good faith to contain highly sensitive trade secret, technical, financial, business or personal information, the disclosure of which is likely to cause harm to an individual or to the business or competitive position of the Party." *Id*.

In November 2011, Plaintiffs and Defendant filed cross-motions to compel. ECF Nos. 69–72. In December 2011, the Court issued an opinion and order granting Plaintiffs' motion and granting in part and denying in part Defendants' motion. *Dow Corning v. Xiao*, No. 11-10008, 2011 WL 6739403 (E.D. Mich. Dec. 22, 2012).

**C**

Defendants now move to compel "all documents concerning fluidized bed reactors that Plaintiffs use in the production of trichlorosilane." Defs.' Mot to Compel 1, ECF No. 119. Specifically, Defendants request:

- "All documents concerning Plaintiffs' use of fluid bed reactors in the production of trichlorosilane";
- "All documents concerning any trade secrets of Plaintiffs regarding the use of fluid bed reactors in the production of trichlorosilane"; and
- "All documents concerning any confidential information of Plaintiffs regarding the use of fluid bed reactors in the production of trichlorosilane."

Defs.' First Request for Production of Documents Nos. 32–34, *attached as* Gross Decl. Ex. H, ECF No. 120-8. "Defendants also respectfully request that Plaintiffs be compelled to produce all documents concerning their remaining alleged trade secrets," Defendants add, "as requested in Requests 33-42 of Defendants' Third Request for Discovery and Inspection." Defs.' Mot. 20. Thus, Defendants request that the Court order Plaintiffs to produce not only the trade secrets regarding the generation one technology allegedly misappropriated by Defendants, but all subsequent generations of the technology as well.

**II**

As a general matter, "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

For trade secrets, however, a different standard applies. The information requested must be not only relevant, but also necessary. *R.C. Olmstead, Inc. v. CU Interface, LLC*., 606 F.3d 262, 269 (6th Cir. 2010); *Laborers Pension Trust Fund v. CRS Poured Concrete Walls, Inc*., No.

04CV74714, 2006 WL 3804912, at *2 (E.D. Mich. Dec. 22, 2006); *see* Fed. R. Civ. P. 26(c)(1)(G).

In this case, the core of Defendants' motion seeks "All documents concerning any trade secrets of Plaintiffs regarding the use of fluid bed reactors in the production of trichlorosilane." Defs.' First Request for Production of Documents Nos. 33. Additionally, Defendants request all documents "regarding the use of fluid bed reactors in the production of trichlorosilane" that do not constitute a trade secret. Defs.' First Request for Production of Documents No. 32, 34. For the following reasons, Defendants are not entitled to the former, but are entitled to the latter.

**A**

"The courts have not given trade secrets automatic and complete immunity against disclosure," the advisory committee notes to Rule 26 observe, "but have in each case weighed their claim to privacy against the need for disclosure." Fed. R. Civ. P. 26 advisory committee notes (1970 amend.) (citing *Covey Oil Co. v. Cont'l Oil Co.*, 340 F.2d 993 (10th Cir. 1965); *Julius M. Ames Co. v. Bostitch, Inc*., 235 F. Supp. 856 (S.D.N.Y. 1964)).

The Sixth Circuit similarly cautions that disclosure should only be compelled "if the trade secrets are deemed relevant *and* necessary." *R.C. Olmstead, Inc*., 606 F.3d at 269 (emphasis supplied) (quoting *Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 326 (10th Cir. 1981)). In evaluating whether the disclosure is necessary, the Sixth Circuit likewise cautions, courts must determine "whether the need outweighs the harm of disclosure." *Id*. That is, courts must balance the movant's interest in discovering information necessary to prove its claims or defenses against the non-movant's "interest in preventing a potential competitor from having access to its [trade secrets]." *R.C. Olmstead, Inc*., 606 F.3d at 269. A brief review of trade secret law shows why trade secrets are subject to a more stringent standard.

Trade secret law, as its name suggests, "protects a person's right to keep certain information 'secret.'" *Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1239 (8th Cir. 1994). Specifically, it protects a person's right to keep "trade secrets" secret.

A trade secret "consists of any valuable formula, pattern, device, process, or other information that is used in one's business and gives the possessor a competitive advantage over those who do not know or use the information." *Rothschild v. Ford Motor Co.*, 2 F. Supp. 2d 941, 950 n.12 (E.D. Mich. 1998) (quoting *Kubik, Inc. v. Hull*, 224 N.W.2d 80, 87 (Mich. Ct. App. 1974)). "It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers." *Restatement (First) of Torts* § 757 cmt. b (1939), *cited in Kubik*, 224 N.W.2d at 87. Factors for evaluating whether information qualifies as a trade secret include:

> (1) the extent to which the information is known outside of [the plaintiff's] business;
> (2) the extent to which it is known by employees and others involved in [the plaintiff's] business;
> (3) the extent of measures taken by [the plaintiff] to guard the secrecy of the information;
> (4) the value of the information to [the plaintiff] and to his competitors;
> (5) the amount of effort or money expended by [the plaintiff] in developing the information;
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* The Michigan Supreme Court summarizes: "The term 'trade secret,' as usually understood, means a secret formula or process not patented, but known only to certain individuals using it in compounding some article of trade having a commercial value." *Glucol Mfg. Co. v. Schulist*, 214 N.W. 152, 153 (Mich. 1927).

The purpose of affording trade secrets protection, the United States Supreme Court explains, is to "encourage invention in areas where patent law does not reach, and . . . prompt the

-9-

independent innovator to proceed with the discovery and exploitation of his invention." *Kewanee Oil v. Bicron Corp.*, 416 U.S. 470, 485 (1974) (citing Gordon Doerfer, *The Limits on Trade Street Law Imposed by Federal Patent and Antitrust Supremacy*, 80 Harv. L. Rev. 1432, 1454 (1967)).[2] "It is cheaper and quicker to obtain," a commentator elaborates, "since it doesn't require government approval, and it extends to protection of types of business and process information that likely would not be patentable." Mark Lemley, *The Surprising Virtues of Treating Trade Secrets as IP Rights*, 61 Stan. L. Rev. 311, 313 (2008).

Trade secrets are thus a type of property — more precisely, they are a type of "intangible property." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984); *see also Follmer, Rudzeqicz & Co., P.C. v. Kosco*, 362 N.W.2d 676, 680–81 (Mich. 1984) ("While an employee is entitled to the unrestricted use of general information acquired during the course of his employment, . . . confidential information, including [trade secrets], constitutes property of the employer."); *but see E.I. du Pont de Nemours Powder Co. v. Masland*, 244 U.S. 100, 102 (1917) (Holmes, J.).

Property, in turn, is a collection of legal entitlements — what Justice Cardozo famously described as a "bundle of power and privileges to which we give the name of ownership." Benjamin Cardozo, *Paradoxes of Legal Science* 129 (1928); *see United States v. Craft*, 535 U.S. 274, 278 (2002) (internal quotation marks omitted) ("A common idiom describes property as a 'bundle of sticks'— a collection of individual rights which, in certain combinations, constitute property."); *see generally* Eric A. Kades, *Property Rights and Economic Development*, 45 Wm. & Mary L. Rev. 815, 817–18 (2004) ("Perhaps most famously, property law scholars speak

---

[2] This utilitarian function, it should be acknowledged, is only a partial explanation — the corollary to promoting useful conduct is, of course, deterring bad behavior. *See generally E.I. du Pont de Nemours Powder Co. v. Masland*, 244 U.S. 100, 102 (1917) (Holmes, J.).

incessantly of the 'bundle of sticks' that constitute property: various combinations of the rights to exclude, to use, and to alienate as the three sticks that, tied together, make up the bundle of rights we commonly associate with the word 'property.'").

"The right to exclude others," the Supreme Court observes, "is generally one of the most essential sticks in the bundle of rights that are commonly characterized as property. With respect to a trade secret, the right to exclude others is central to the very definition of the property interest." *Ruckelshaus*, 467 U.S. at 1011 (internal citation and quotation marks omitted) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)).

With power to exclude, however, comes the power to stifle competition. The Copyright and Patent Clause, for example, "reflects a balance between the need to encourage innovation and the avoidance of monopolies which stifle competition without any concomitant advance in the Progress of Science and useful Arts." *Bilski v. Kappos*, 130 S. Ct. 3218, 3252 (2010) (Steven, J., concurring).

Trade secret law reflects the same basic tension — the need to give the trade secret holder a sufficiently large "stick" to encourage discovery and invention, but not so large as to encourage wasteful bludgeoning of competitors. The goal is not to maximize legal protection, but to balance it. As applied to discovery, this balancing involves a burden shifting analysis:

> To resist discovery . . . a person must first establish that the information sought is a trade secret and then demonstrate that its disclosure might be harmful. If these requirements are met, the burden shifts to the party seeking discovery to establish that the disclosure of trade secrets is relevant and necessary to the action. The district court must balance the need for the trade secrets against the claim of injury resulting from disclosure. If proof of relevancy or need is not established, discovery should be denied. On the other hand, if relevancy and need are shown, the trade secrets should be disclosed, unless they . . . are unreasonable, oppressive, annoying, or embarrassing.

*Centurion Indus*, 665 F.2d at 325–26, *cited in R.C. Olmstead*, 606 F.3d at 269.

In evaluating harm, "courts have presumed that disclosure to a competitor is more harmful than disclosure to a noncompetitor." *Cytodyne Techs., Inc. v. Biogenic Techs., Inc*., 216 F.R.D. 533, 536 (M.D. Fla. 2003) (citing *United States v. United Fruit Co*., 410 F.2d 553, 557 (5th Cir. 1969); *Coca–Cola Bottling Co. v. Coca–Cola Co*., 107 F.R.D. 288 (D. Del. 1985)).

In this case, it is not disputed that Plaintiffs and Defendants are competitors. Likewise, it is not disputed that Defendants seek Plaintiffs' trade secrets — Defendants expressly request "All documents concerning any trade secrets of Plaintiffs regarding the use of fluid bed reactors in the production of trichlorosilane." Defs.' First Request for Production of Documents No. 33. Plaintiffs carry their threshold burden to resist discovery of their trade secrets.

Defendants, in contrast, do not carry their burden of establishing that the information sought is necessary. As a preliminary matter, "necessary" has not been defined by the Sixth Circuit. *Webster's Dictionary* defines it as an adjective for a thing "that must be"; "that cannot be done without"; "[that is] absolutely required"; and "[that] of, relating to, or having the character of something that is logically required." *Webster's Third International Dictionary* 1510 (unabridged ed. 2002).

Courts generally track these definitions, with some adopting the narrower "absolutely required" denotation, some adopting the slightly broader "logically required" denotation. For courts following Dean Wigmore, "necessary" is synonymous with "indispensable" — "disclosure of legitimate trade secrets will not be required except to the extent that it appears to be indispensable for ascertainment of the truth." *Drake v. Herrman*, 185 N.E. 685, 686 (N.Y. 1933) (citing John Henry Wigmore, *Wigmore on Evidence* § 2212 (2d ed. 1923)); *Automatic Drilling Machs., Inc. v. Miller*, 515 S.W.2d 256, (Tex. 1974) ("A public disclosure of trade secrets should not be required, however, except 'in such cases and to such extent as may appear

to be indispensable for the ascertainment of truth.'" (quoting 8 John Henry Wigmore, *Evidence* § 2212(3) (McNaughton rev. 1961))). Other courts, however, have equated "necessary" with "essential," thus holding "that the inquiries must relate to an essential element of the party's case." W. R. Frothingham, *Discovery or Inspection of Trade Secret, Formula, or the Like*, 17 A.L.R.2d 383 § 3(c) (West 2012) (collecting cases).

In this case, Defendants do not establish that the trade secrets are either indispensible or essential to their case. Defendants request that the Court order Plaintiffs to produce all their fluid bed reactor trade secrets, not merely those specifically at issue in this case. That is, Defendants seek not just the "generation one" technology that Mr. Little is alleged to have taken with him when he left Dow Corning in 2002 (Plaintiffs have produced these trade secrets), but all subsequent generations as well.

Explaining why they seek this information, Defendants assert that if the later generations are different, the generation one technology may be obsolete. "The new FBR designs," Defendants write, "are . . . relevant to Defendants' contention that the [first generation] FBR design sued upon by Plaintiffs is obsolete and has no value as a trade secret. Defendants assert that there is no trade secret value to FBR dimensions that Plaintiffs no longer use when building FBRs." Defs.' Mot 1. Defendants elaborate:

> The fact that Plaintiffs do not use "many" of the FBR characteristics identified as trade secrets here in their more recently built facilities is indisputably relevant to the value of the prior characteristics. Obsolete information cannot constitute a trade secret because the information has no economic value. . . . Moreover, Plaintiffs' failure to use these alleged trade secrets in their new facilities directly contradicts the Complaint's allegations that Plaintiffs' alleged trade secrets at issue here represent "optimal methods, techniques, and processes." The dimensions upon which Plaintiffs bring suit can hardly be "optimal" when Plaintiffs have abandoned those dimensions when building new FBRs for TCS production.

*Id*. at 12 (internal citations omitted).

Plaintiffs respond that their generation one technology is not obsolete, noting that both they and Defendants use it:

> The fluid-bed reactor technology at issue is still currently in use at [Plaintiffs'] Michigan facility and regularly produces TCS for use in high-grade polysilicon. Moreover, documents produced in discovery in this case demonstrate that defendants marketed and successfully sold this technology without plaintiffs' authorization for millions of dollars to at least three of their clients — LDK Solar, KMYY, and Woongjin — and indeed, it appears to be the only FBR technology that defendants ever successfully sold.

Pls.' Resp. to Defs.' Mot. 7–8 (internal citations, emphasis, and footnote omitted), ECF No. 127. Addressing Defendants' "optimal" argument, Plaintiffs observe that information need not be "optimal" to constitute a trade secret, merely "valuable":

> Second, defendants repeatedly claim that plaintiffs' technology cannot be "optimal" if they use different technology at the [Michigan] plant or at different sites across the globe. But defendants themselves have laid out the elements of a trade-secret misappropriation claim under Michigan law; nowhere do those elements require a plaintiff to show that certain technology is "optimal." The law merely requires that the information be valuable to plaintiffs and their competitors. . . .
>
> What is relevant for present purposes is that both parties agree upon the key comparison at issue — the similarities and differences between the specific FBR that plaintiffs allege was misappropriated and the FBR that defendants sold to LDK Solar, KMYY, and Woongjin. The dimensions of other FBRs used by plaintiffs have no bearing on the critical comparison that this Court, or a jury, must make.

Pls.' Resp. 8 (internal citations and emphasis omitted). Plaintiffs' argument is persuasive.

As a threshold matter, Defendants are correct that "obsolete information" cannot be protected as a trade secret "because the information has no economic value." Defs.' Mot. 12 (quoting *Fox Sports Net North, LLC v. Minnesota Twins P'ship*, 319 F.3d 329, 336 (8th Cir.

2003)). But discovering all of Plaintiffs' trade secrets is not necessary to determining if the allegedly misappropriated information "has no economic value." Defs.' Mot. 12.

A later generation of a technology does not necessarily render a prior generation obsolete. Multigenerational diffusion, as noted, is a fairly common strategy.[3] Boeing's three major assembly facilities, for example, respectively started production in 1941, 1967, and 2011. The manufacturing processes associated with producing a Boeing 787 at the South Carolina facility that opened in 2011 do not render the processes associated with producing a Boeing 777 at the Washington State facility that opened seventy years earlier of "no economic value."

Plaintiffs pursue a similar multigenerational diffusion strategy. The later generations of fluid-bed technology do not determine whether the first generation technology has "no economic value." Rather, whether some entity was willing to pay for the first generation technology during the period of time relevant to this action determines whether that technology has no economic value. *See generally* Richard Posner, *Economic Analysis of Law* 10 (6th ed. 2003) ("The economic value of something is how much someone is willing to pay for it or, if he has it already, how much money he demands for parting with it."). Defendants do not need the trade secrets demanded to establish their asserted defense of obsolescence.

Similarly, Defendants are correct that one of the factors "to be considered in determining whether given information is one's trade secret" is "the 'value' of the information." Defs.' Mot. 11 (quoting *Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 614 (Mich. 1984)). And Defendants are correct that the circumstances surrounding the development and implementation of the later

---

[3] *See, e.g.*, Vijay Mahajan et al., "New-Product Diffusion Models: From theory to Practice," *in New-Product Diffusion Models* 10 (2000) ("Determination of optimal introduction time is especially critical for high-technology products where the introduction of each successive generation of a product requires the firm to explicitly consider its impact on the demand for the preceding generations and vice versa. . . . Introduction time, therefore, may influence both the product's own diffusion and the diffusion of the preceding generations.").

generations of fluid bed technology could be relevant for calculating the value of first generation technology at issue in this case. As detailed above, however, for establishing the monetary value of the first generation technology the later generations' trade secrets are not necessary.

The value of the information contained in the trade secrets associated with generation one technology depends on "how much someone is willing to pay for it." Posner, *supra*, at 10. Defendants do not need to know the trade secrets of a different product to determine what the value of the product at issue is. They need to know whether someone was willing to pay for the product at issue during the period of time relevant to this action (and, perhaps, how much).

Finally, Defendants are correct that the trade secrets regarding the later generations could be used to rebut "the Complaint's allegations that Plaintiffs' alleged trade secrets at issue here represent 'optimal methods, techniques, and processes.'" Defs.' Mot 12. But, as Plaintiffs correctly observe, trade secret law does not "require a plaintiff to show that certain technology is 'optimal.' The law merely requires that the information be valuable to plaintiffs and their competitors." Pls.' Resp. 8; *see, e.g.*, *Kubik, Inc. v. Hull*, 224 N.W.2d 80, 87 (Mich. Ct. App. 1974) (discussed above). As Plaintiff need not prove that the first generation trade secrets are "optimal," the later generation trade secrets are not necessary to Defendants' case.

Defendant's motion to compel production of trade secrets regarding later generations of the fluid bed technology will be denied.

**B**

While the trade secret information forms the core of Defendant's motion, Defendants also request peripheral information. Specifically, Defendants request all documents containing general and confidential information "concerning Plaintiffs' use of fluid bed reactors in the production of trichlorosilane." Defs.' First Request for Production of Documents No. 32, 34.

Plaintiffs object that this demand is unduly burdensome and expensive, writing "defendants seek information that is at best marginally relevant, and that would impose undue burden and expense on plaintiffs." Pls.' Resp. 14. Plaintiffs' argument is unpersuasive.

Plaintiffs themselves demanded from Defendants "Any and all documents concerning fluid bed reactors" and "Any and all documents concerning any products or services offered by Defendants relating to . . . trichlorosilane." Plaintiffs' First Set of Requests for Production Nos. 2, 11, *attached as* Gross Decl. Ex. H, ECF No. 120-8. As Defendants pointedly observe, they "are entitled to a level playing field." Defs.' Reply 5, ECF No. 129; *see also* Defs.' Mot. 5 (noting that "Defendants have produced approximately 100,000 pages of documents and Plaintiffs have produced approximately 4,000 pages"). As Plaintiffs concede that this information requested is (marginally) relevant, Defendants are entitled to it.

## IV

Accordingly, it is **ORDERED** that Defendants' motion to compel (ECF No. 119) is granted in part and denied in part. Defendants are not entitled to the requested trade secrets. Defendants are, however, entitled to discover the other documents demanded concerning Plaintiffs' use of fluid bed reactors in the production of trichlorosilane

It is further **ORDERED** that the hearing scheduled for Tuesday, June 19, 2012 at 3:00 p.m. is **CANCELED** because the parties' papers provide the necessary factual and legal information to decide the motion. *See* E.D. Mich. L.R. 7.1(f)(2).

Dated: May 31, 2012

                                            s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 31, 2012.

> s/Tracy A. Jacobs
> TRACY A. JACOBS